BRUDER *v.* STATE.

Opinion delivered December 8, 1913.

1. CONTINUANCES—CRIMINAL TRIAL—DISCRETION OF COURT.—The continuance of a trial in a criminal case is within the sound discretion of the trial court, and the refusal of the court to grant a continuance will never be ground for a reversal of a judgment of conviction unless it clearly appears that there has been an abuse of such discretion and that it manifestly operates as a denial of justice. (Page 409.)

2. CONTINUANCES—NONRESIDENT WITNESSES—DISCRETION OF COURT.—It is not an abuse of the trial court's discretion to refuse a continuance of a criminal trial on account of the absence of nonresident witnesses. (Page 409.)

3. JURY—RIGHT TO EXCUSE FOR SICKNESS.—The court may properly excuse a juror who has been accepted by both sides, on account of the juror's being sick. (Page 409.)

4. WITNESSES—CROSS EXAMINATION.—It is proper on cross examination to interrogate a witness concerning his present or recent residence, occupation and association (Page 409.)

5. EVIDENCE—REFRESHING RECOLLECTION—MEMORANDUM AS EVIDENCE.— Where a witness used a memorandum containing some measurements made by himself to refresh his recollection, it is not error to refuse to permit the memorandum to be submitted to the jury for their inspection (Page 410.)

6. INSTRUCTIONS—SPECIFIC OBJECTIONS.—Where an instruction given by the court consisted of three paragraphs, two of which properly declared the law, a general objection to the instruction is insufficient, although the third paragraph does not properly state the law.  (Page 411.)

7. WITNESSES — CREDIBILITY — INSTRUCTIONS — GENERAL OBJECTIONS.— Where an instruction in effect charges the jury that they are the judges of the credibility of the witnesses, although one or more of them had been impeached, and that if they believe a witness had sworn falsely in part and truthfully in part, they should reject that portion which they believe to be false, and accept that part which they believe to be true, it will not be held bad when objected to generally.  (Page 411.)

8. INSTRUCTIONS—ISSUES INVOLVED.—All the phases of a cause need not be contained in each instruction given.  (Page 414.)

9. HOMICIDE—SELF-DEFENSE—JUSTIFICATION.—Where defendant killed deceased under the belief that deceased was about to assault him, if he acted too hastily and without due care, and was not therefore justified in taking life under the circumstances, he is guilty of manslaughter.  (Page 414.)

10. TRIAL—ARGUMENT OF COUNSEL—TIME OF ARGUMENT.—Where counsel representing both sides agreed upon the length of time to be allowed to each to argue the case before the jury, it is not error for the trial court to refuse to permit one counsel to use time allotted to other counsel, which the latter had not used.  (Page 415.)

Appeal from Scott Circuit Court; *Daniel Hon,* Judge; affirmed.

STATEMENT BY THE COURT.

The defendant, John Bruder, was indicted for murder in the first degree, charged to have been committed by shooting Tony Bly. The facts proved by the State, briefly stated, are as follows:

The deceased, Tony Bly, was the proprietor of a saloon in the city of Fort Smith, in Sebastian County, Arkansas, and was killed in it by the defendant shortly after 5 o'clock in the afternoon of the 23d day of January, 1913. The defendant had been in the saloon earlier in the afternoon, in the absence of the deceased, and had assaulted one of deceased's customers and beat him up. Between 3 and 4 o'clock in the afternoon, after the deceased had returned to his saloon, the defendant again

entered it. Deceased was behind the counter, and called the defendant to him and told him that he understood that he had had some trouble there, and said that he did not want him to come in his place any more raising trouble with his customers. He told the defendant he was trying to run a decent place, and that if he came in there any more and beat up any of his customers, he was going to take a gun and kill him. Defendant told him that if he felt that way about it he would not come in any more, and, after shaking hands, the defendant left the saloon. Later, he returned to the sidewalk in front of the saloon, and stood around and walked up and down the sidewalk for a while. He raised on tiptoes and looked in at the front window of the saloon, and then walked off. He then returned and walked into the saloon, and, drawing an automatic revolver out of his overcoat pocket, shot the deceased five times. When the defendant began to shoot, the deceased threw up his hands and began to back off. The deceased was behind the counter, and continued to back with his hands upraised until he fell to the floor.

One of the witnesses for the State says that he was standing, talking to the deceased, when the defendant came in; that he heard some one say, "Tony, did you say you would kill me?" That he looked around and saw the defendant there. That he then heard Bly say, "Yes, I said I would kill you if—" and that he did not hear the rest of the sentence. That defendant was standing there with his hand in his overcoat pocket and jerked out his pistol and began to shoot at the deceased, and shot five times in rapid succession. That the deceased made no hostile demonstrations toward the defendant, but raised his hands and began to back away.

The deceased died a few days later from the effects of the gunshot wounds. Several eye-witnesses to the killing testified that the deceased made no hostile demonstrations whatever toward the defendant, and that he was unarmed.

John Bruder, the defendant, testified for himself:

I was drinking heavily on the day that I shot deceased, and had been for several days prior thereto. On the afternoon of the killing, as I walked out of the saloon, Bly, who was sitting behind the little office, said to me: "If you come in here again, I am going to kill you." I asked him what he meant, and he repeated his statement. I shook hands with him and walked out. I was not mad, and did not know that he was. I had tried to borrow a pistol before this from Mack Dean. I told him I was staying out at my brother's house, which was situated away from other houses, and I needed a pistol to protect me. Later, I met another friend who told me where I could get a pistol, and I went over there and got it. A young man whom I did not know had told me that he would go out to the house and stay all night with me, and I started out to find him. I looked in the door of Bly's saloon for him and did not see him. Afterward, I came back and looked in again, and changed the pistol from my pants pocket to my overcoat, because it was rubbing my leg. While I was standing there in front of the deceased's saloon, some one came out and told me they wanted to see me in the saloon. I asked him who wanted to see me, and he replied that it was Tony Bly. I told him that Tony was mad at me and half crazy, and he said that was all over and Tony wanted to apologize. I looked in and saw Tony, and he motioned to me to come in. I went in, and he was standing behind the counter. I said to him, "What do you want, Tony? You said you were going to kill me?" He replied, "Yes, that is what I said, and I am going to do it;" and he reached for his gun. When he did that, I commenced shooting. I had an automatic pistol, and do not know how many times I shot.

Cross examination: When Tony said he was going to kill me, he reached behind him, and I do not know whether he reached for his pocket or reached for the shelving. I reached across the counter to do the shooting.

In rebuttal, the State introduced a number of wit-

nesses who testified that they knew the reputation of the defendant for truth and morality in Fort Smith, where he lived, and that it was bad.

The jury returned a verdict of guilty of murder in the second degree, and fixed the defendant's punishment at a term of twenty-one years in the State penitentiary.

*Cravens & Cravens* and *T. N. Sanford,* for appellant.

1.   The court erred in refusing a continuance.   100 Ark. 307; 99 *Id.* 547; 103 *Id.* 353.

2.   It was error to excuse J. A. Wagoner as a juror who had been accepted by both sides; also to refuse to discharge the entire panel.   Kirby's Dig., § § 2360, 2396; 63 Ark. 527.

3.   The court erred in permitting the State to ask leading questions of the witness, Trice.   92 Ark. 237; 84 *Id.* 81; 63 *Id.* 108.

4.   Counsel have the right to inspect any memorandum used by an opposing witness.   149 Fed. 123; 40 .Cyc. 2463; 34 Mich. 369; Jones on Ev., § 876 (2 ed.); 98 Am. Dec. 616; 1 Gr. on Ev. (14 Ed.) 466.

5.   Dean's testimony was admissible, as corroborative of defendant's.   14 Ark. 555; 52 *Id.* 310; 34 *Id.* 732; 29 *Id.* 386; 24 *Id.* 507; 53 *Id.* 387; 91 *Id.* 555; 99 *Id.* 604; 78 *Id.* 293; 70 *Id.* 110.

6.   The court's charge to the jury was erroneous. 67 Ark. 595; 62 *Id.* 306; 56 *Id.* 242; 82 *Id.* 505; 68 *Id.* 337.   The giving of an incorrect instruction is not cured by giving a correct one.   107 Ark. 245; 65 *Id.* 64.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1.   There was no error in refusing a continuance. *Valentine* v. *State,* 108 Ark. 594.

2.   The burden of proof is upon him who applies for a continuance for an absent witness to show that he used due diligence, etc.   94 Ark. 169.   The discretion of the court was not abused.   94 Ark. 538, 545-7.

3. Wagoner, the juror, was properly excused for illness. 99 Ark. 462-474.

4. The offering party has no right to treat a memorandum used to refresh memory as evidence by reading it to the jury. 1 Wig. on Ev., § 673, note 1.

5. The cross examination of Dean was permissible. 53 Ark. 379-390.

6. The instructions were correct; but, if not, no proper objections were saved. *Scroggin* v. *State,* 109 Ark. 510; 94 Ark. 169; 108 Ark. 508.

HART, J., (after stating the facts). The first assignment of error relied upon by the defendant for the reversal of the judgment of conviction is that the court erred in refusing to grant him a continuance. The motion states that T. V. Sprinkles and Chance Rodgers would testify that, immediately prior to the killing, they were standing in front of deceased's saloon, when some young white man came out of the saloon and told the defendant that deceased wanted him to come in the saloon and that Bruder replied: "I do not want to come in because Tony is mad and half crazy." That the man then said: "Tony is all right now and wants you to come in." And Bruder replied: "Well, if he is all right and wants to see me, I will go in;" and immediately he went into the saloon. That defendant is informed and believes that the witness, Sprinkles, is at his home in Poteau, Oklahoma, confined by illness, and is unable to attend court. That the witness, Rodgers, is at his home at Stigler, Oklahoma; but that both of said witnesses can and will be present at the next term of the court. A certificate of a physician was introduced, to the effect that Sprinkles was under his care and was too sick to attend the trial. The motion for continuance also stated that W. L. Peevey would testify, if present, that just before the shooting he heard the deceased tell some young man whom he did not know to go out in front of the saloon where Bruder was and tell him to come inside. That Peevey was duly served with a subpoena in this case, and that his home was in Crawford County, Arkan-

sas.  One of defendant's attorneys testified that he had taken the affidavit of Peevey as to what his testimony would be.  That he had pointed Peevey out to a deputy sheriff in the city of Fort Smith, and that the witness had been duly served with a subpoena, and that he had seen Peevey in Fort Smith not longer than a week before the trial.  In regard to the witness, Rodgers, it may be said that no excuse whatever is shown by the defendant for his non-attendance at the trial, and no testimony is given tending to show that he could be procured at the next term of the court if the case was continued.  Rodgers was a non-resident of the State of Arkansas, and his attendance at the trial could not be compelled under the process of the court.  Sprinkles was also a non-resident of the State, and was, therefore, beyond the jurisdiction of the court.  It is true that a certificate of a physician was presented to the court, showing that the witness was sick and unable to attend court; but this is not sufficient to show that his voluntary attendance at court could have been procured.  His deposition might have been taken, under the statute, and no excuse for not doing so is shown.  The court offered to permit defendant to read the affidavits of both these witnesses, taken by his attorney at Fort Smith some time prior to the trial.  The defendant proved by a lawyer in attendance at court that he had known Lon Peevey for about ten years; that he lived south of Alma and was a farmer; that it had been four or five years since he saw him last and that he did not know where he is now.  The witness was a resident of Fort Smith, and said that he had not seen him in Fort Smith lately.  There is nothing to show that Lon Peevey was the same person as W. L. Peevey, who had been subpoenaed to attend the trial of this case.  For aught that appears from the record, the W. L. Peevey that was subpoenaed as a witness in this case may have been a nonresident of the State and beyond the jurisdiction of the court.  At least, there is nothing in the record to show that he lived within the jurisdiction of the court, or

that his attendance could have been procured if the case had been continued. It is well settled in this State that the continuance of a trial in a criminal case is within the sound discretion of the trial court, and that the refusal of the trial court to grant a continuance will never be ground for a reversal of a judgment of conviction unless it clearly appears that there has been an abuse of such discretion and that it manifestly operates as a denial of justice. *Miller* v. *State,* 94 Ark. 538; *Jacks* v. *State,* 44 Ark. 61.

It is next assigned as error that the court erred in excusing J. A. Wagoner, a juror, who had been accepted by both sides to try the case. Wagoner was the fifth juror selected, and at the time of his selection the defendant had exercised only seven peremptory challenges; but at the time he was excused by the court, eight jurors had been selected, and the defendant had exercised fifteen peremptory challenges. The juror became suddenly ill after he had been accepted, and, on account of his illness, was excused by the court. We have held that it was within the discretion of the court to excuse a juror on account of sickness. *Caughron* v. *State,* 99 Ark. 462. Therefore, the court did not err in excusing the juror.

It is next contended by counsel for defendant that the court erred in permitting cross examination of witness, Dean, concerning his residence and association. Mack Dean had testified for the defendant that he had seen him several times on the day of the killing and had been in his company frequently for several days prior thereto; that the defendant was very drunk on the day of the killing, and had been drinking heavily for several days. That defendant had told him on a day prior to the killing that he did not have any gun and wanted to borrow one because he was afraid to travel from the car line to the house where he slept. In response to questions asked him on cross examination, the witness testified that he had married a woman who ran a whore house and later had been divorced from her; that a scar which

was on his face was the result of a fight in the whore house.  It is always competent to interrogate a witness on cross examination touching his present or recent residence, occupation and association.  *Hollingsworth* v. *State,* 53 Ark. 387.

The next assignment of error is that the judgment should be reversed because the court refused to compel Trice, a witness for the State, to show a memorandum to defendant's counsel.  Trice was an eye witness to the killing, and was by occupation a carpenter.  It appears that while he was being cross examined by defendant's counsel in regard to the width of the counter, shelving, etc., in the saloon where the killing occurred, he refreshed his memory by referring to a memorandum of measurements which he had himself made.  The questions and answers show that the witness was referring merely to a memorandum of some figures he had made of his own accord of the width of the counter, shelving, etc., in the saloon.  Under these circumstances, the court did not err in refusing to permit the defendant to have said memorandum submitted to the jury for their inspection. 1 Wigmore on Evidence, § 673.

It is next insisted by counsel for defendant that the court erred in giving instruction No. 17, at the instance of the State, which is as follows:

"A witness may be impeached by the party against whom he is produced, by contradictory evidence, by showing he has made statements different from his present testimony, or by evidence that his general reputation for truth or morality renders him unworthy of belief.

"But the jury are the sole judges of whether the witness has been impeached, and if an impeached witness is corroborated, the jury may still take his testimony, notwithstanding the impeachment, and are judges of his credibility, and may take and consider it, if they believe he has sworn truthfully, although he is impeached.

"If the jury believe any witness has sworn falsely to any material fact, they may disregard the whole or any part of his testimony."

The objection urged to the instruction by the defendant is that the third paragraph warranted the jury in disregarding testimony it believed to be true if it came from a witness whom the jury believed had sworn falsely to some other material fact. They cite, in support of their contention, *Frazier* v. *State,* 56 Ark. 242; *Taylor* v. *State,* 82 Ark. 540; *Bloom* v. *State,* 68 Ark. 337. It is true that an instruction standing by itself in substantially the same form as the third paragraph of instruction No. 17 was condemned in the cases cited by defendant. The reason given was that before you can disregard the testimony of a witness for false swearing, the false swearing must be wilfully done; and, moreover, the instruction might be construed as warranting the jury in disregarding the testimony which it believed to be true, if it emanated from a witness who had sworn falsely to some other fact. In the case of *Darden* v. *State,* 73 Ark. 315, at page 320, the court said:

"The exception to the instruction given by the court on his own motion and copied in this opinion was general. The objection urged against it in this court is that the court said a reasonable doubt is one for which a juror could give a reason, if called upon to do so. If this be a defect, which we think it was, it should have been reached by a specific objection. It is one the court would have doubtless readily remedied if its attention had been called to it. The objection extended to the whole instruction, consisting of four paragraphs, and, one or more of these being sufficient, it should not have been sustained. See *St. Louis, I. M. & S. Ry. Co.* v. *Barnett,* 65 Ark. 255."

In the application of the rule there announced to the present case, we do not think the judgment should be reversed for the error complained of. No specific objection was made to the instruction, but only an objection made to it as a whole. The instruction is in three paragraphs. The first paragraph is a correct declaration of the law. No objection is urged by the defendant to the

second paragraph, and we can perceive none to it that would not have been cured by a specific objection. The first part of the second paragraph of the instruction tells the jury if an impeached witness is corroborated, the jury may still take his testimony, notwithstanding the impeachment. This was wrong, because it was the duty of the jury to receive and consider the testimony of the witness, notwithstanding his impeachment, if they believed his testimony to be true; and the jury are, in effect, told this in the latter part of the paragraph. In effect, the second paragraph told the jury that they were the judges of the credibility of the witnesses, and that they must take and consider the testimony of any witness, if they believe he has sworn truthfully, although he may be impeached in one of the manners provided by law. The third paragraph of the instruction, if standing alone, would be objectionable, under the rule laid down in the cases cited by counsel for defendant, *supra,* and would be reversible error; but when we consider that the objection extended to the whole instruction, consisting of three paragraphs, and that the remaining paragraphs were not open to any valid objection, we are of the opinion, under the rule announced in the case of *Darden* v. *State, supra,* the objection to the third paragraph of the instruction should not be sustained and the judgment reversed, for the reason that the defect contained in it should have been met by specific objection. We think that when the whole instruction is read together, it, in effect, tells the jury that they are the judges of the credibility of the witnesses, although one or more of them had been impeached, and that if they believe a witness has sworn falsely in part and truthfully in part they should reject that portion which they believe to be false and accept that part they believe to be true. See also *Bennett* v. *State,* 95 Ark. 107.

It is next contended by counsel for defendant that the court erred in giving instruction No. 12, which is as follows:

"No one, in resisting an assault made upon him in the course of a sudden brawl or quarrel, or upon a sudden rencounter, or in a combat on a sudden quarrel, or from anger suddenly aroused at the time it is made, or in a mortal combat, is justified or excused in taking the life of the assailant, unless he is so endangered by such assaults as to make it necessary to kill the assailant to save his own life, or to prevent a great bodily injury, and must have employed all the means in his power, consistent with his safety, to avoid the danger and avert the necessity of killing. He can not provoke an attack or bring on the combat, and then slay his assailant, and claim exemption from the consequences of killing his adversary on the ground of self-defense. He can not invite or voluntarily bring upon himself an attack with the view of resisting it, and when he has done so, slay his assailant, and then shield himself on the assumption that he was defending himself. He can not take advantage of a necessity produced by his own unlawful and wrongful act. After having provoked or invited the attack, or brought on the combat, he can not be excused or justified in killing his assailant for the purpose of saving his own life, or preventing a great bodily injury, until he has, in good faith, withdrawn from the combat, as far as he can, and done all in his power to avoid the danger and avert the necessity of the killing."

"The court charges you that a necessity either actual or apparent, as explained in the instruction in this case, is the sole excuse which will justify the taking of human life."

It is conceded by counsel for defendant that this instruction is taken from *Carpenter* v. *State,* 62 Ark. 286; but it is contended that the instruction is erroneous because, according to the testimony of the defendant, he was assaulted by the deceased with a murderous intent when he entered the saloon, and he was, therefore, under no obligation to retreat. The instruction, as given, was predicated upon the evidence adduced in behalf of the

State. The theory of the defendant was fully covered by other instructions given by the court, and it is well settled that all phases of a case can not, and need not, be contained in one instruction. Therefore, the court did not err in giving this instruction.

It is also contended by counsel for defendant that the court erred in giving instruction No. 11, which is as follows:

"Before the defendant can justify the killing of deceased upon the grounds of self-defense, it must appear to him at the time as a reasonable person that the danger of losing his own life or receiving a great bodily injury at the hands of the deceased, was so urgent and pressing that the killing was necessary to save his own life, or prevent his receiving great bodily injury. He must have acted with due caution and circumspection. If there was no danger, and his belief of the existence thereof be imputable to negligence, he is not excused, however honest the belief may be. He must have used all reasonable means in his power, consistent with his safety, to avoid the danger and avert the necessity of killing the deceased.

"It must also appear that the deceased was the assailant, and began the encounter which resulted in his death, or that defendant had really and in good faith endeavored to decline any farther contest before the mortal injury was given.

"If the defendant wilfully and of his malice aforethought, and after premeditation and deliberation, killed the deceased, Tony Bly, while laboring under a sense of wrong or some indignity, real or fancied, that the deceased had done him, he would be guilty of murder in the first degree."

They say that the first paragraph of this instruction told the jury in substance that if there was really no danger to the defendant at the time of the killing, no matter how honest such belief of danger was in his mind, if such belief was imputable to negligence, the defendant

would be guilty of murder. We do not think the first paragraph of the instruction conveyed any such impression upon the minds of the jury. That paragraph of the instruction dealt exclusively with the question of justification, and did not, in any way, touch upon the subject of murder or even manslaughter. This court has held that where a jury believes that the defendant shot under the belief that he was about to be assaulted, but that he acted too hastily and without due care, and was therefore not justified in taking life under the circumstances, he is guilty of manslaughter. *Allison* v. *State,* 74 Ark. 444; *Brooks* v. *State,* 85 Ark. 376. But, as we have already stated, the court, in the first paragraph of the instruction, was dealing exclusively with the question of self-defense, and in other instructions given defined manslaughter and told the jury under what circumstances the defendant would be guilty of that offense. We do not think the court erred in giving this instruction.

Finally, it is insisted by counsel for defendant that the judgment should be reversed because the court arbitrarily curtailed the time allowed the defendant's counsel within which to argue the case. Before beginning the argument, the court and attorneys agreed on four hours on each side, which the attorneys stated to the court they would divide as follows: That W. A. Bates, for the prosecution, should take one hour, and A. A. McDonald and Paul Little, for the prosecution, one and one-half hours each; and for the defendant, T. N. Sanford and Ben Cravens, two hours each. T. N. Sanford opened for the defendant, and lacked twenty-five minutes of consuming the two hours allotted to him for his argument. Mr. Cravens, the other counsel for the defendant, requested the court to allow him in his argument to use the time remaining to Mr. Sanford, which the court refused to do. Counsel for the defendant having specifically agreed to the amount of time that was to be used by each one in making his argument to the jury, are not now in an attitude to complain that the court refused to allow

Mr. Cravens to use the time which had not been consumed by Sanford in his opening argument for the defendant. If the court had allowed four hours to the defendant, then he would not have had any right to direct how much of this time should be consumed by each attorney; but the attorneys would have the right to divide the time as best suited them. But, for the reason that they agreed in advance as to how much time should be consumed by each of them, the defendant is not now in an attitude to complain that the court did not grant Cravens the right to use the time that had been allotted to Sanford.

Other assignments of error have been urged upon us for a reversal, but we do not deem it necessary to discuss them. We have considered them carefully, and have reached the conclusion that the case was fairly tried upon proper instructions given by the court, and that the evidence warranted the verdict. Therefore, the judgment will be affirmed.