CENTRAL COAL & COKE COMPANY v. LOCKHART.

Opinion delivered November 19, 1923.

1.  MASTER AND SERVANT—NEGLIGENCE—QUESTION FOR JURY.—In an action for injuries to servant operating an electric motor in a coal mine, sustained in collision with a car which had become uncoupled by reason of a defective hook, evidence *held* insufficient to submit to the jury on the question of negligence in furnishing a defective hook, in the absence of any evidence as to how long the hook had been defective.

2.  MASTER AND SERVANT—NEGLIGENCE—BURDEN OF PROOF.—An employee suing his employer for personal injuries has the burden of proving the latter's negligence.

3.  MASTER AND SERVANT—NEGLIGENCE AS TO LIGHTS—JURY QUESTION. —In an action for personal injuries to one operating an electric motor in a coal mine, the question whether the employer was negligent in failing to provide sufficient lights *held* for the jury.

4.  MASTER AND SERVANT—DEFENSES—JURY QUESTIONS.—In an action for injuries to a servant operating an electric motor in a coal mine, the questions of contributory negligence and assumed risk *held* for the jury.

5.  TRIAL—INSTRUCTION—ASSUMPTION OF DISPUTED FACT.—In an action for personal injuries alleged to have been caused by defective lights in a coal mine, an instruction on assumed risk *held* not objectionable as against contention that it assumed that there was a promise to repair.

6.  MASTER AND SERVANT—ASSUMED RISK—RELIANCE ON PROMISE TO REPAIR.—A servant does not assume the risk of working with defective lights, where he continues to work for a reasonable time after the master has promised to repair the lights.

7.  APPEAL AND ERROR—INSTRUCTION SUBMITTING TWO ISSUES—OBJECTION.—Where an instruction submitted two issues, one of which only was unsupported by evidence, the defendant could not complain of the submission of both issues, where no specific objection was saved to the submission of the unsupported issue.

Appeal from Prairie Circuit Court, Northern District; *George W. Clark,* Judge; affirmed.

*Pryor & Miles,* for appellant; *F. E. Brown* and *J. W. Goolsby,* of counsel.

No defect in the car or goose-neck was proved, nor was it proved that a careful inspection would have discovered a defect. 133 Ark. 336; 82 Ark. 372; 79 Ark. 437. No obligation rests upon an employer to inspect

simple tools and appliances. 108 Ark. 383; 99 Pac. 131; 82 S. W. (Tex.) 1026; 141 Ky. 40, L. R. A. (N. S.) 837; 88 Ark. 36; 130 Ark. 490. There was no such promise to repair made as to the lights as would relieve appellee of the assumption of risk in operating the motor in the manner which he did. The promise of the electrician was that he would try and get him better lights. He did not continue to work solely on such a promise. The danger of running at an excessive speed with dim lights was apparent to him, from appellee's own testimony. See 101 Ark. 541; 88 Ark. 34; 127 Iowa 84. Appellee assumed the risk. *Lewelling Const. Co.* v. *Longstreth,* 156 Ark. 236; 96 Ark. 387; 135 Ark. 488; 134 Ark. 491. No statutory duty on the part of appellant was violated. See 220 U. S. 590; 241 U. S. 229. A verdict based upon surmise or conjecture is not warranted. 109 Ark. 206.

*A. M. Dobbs, Bogle & Sharp* and *G. L. Grant,* for appellee.

Under the evidence adduced, a directed verdict in favor of appellant was properly refused. 148 Ark. 74; 120 Ark. 208; 105 Ark. 526. The promise made to repair the lights justified the servant in remaining in service. 54 Ark. 289. It was a question for the jury, taking into consideration the circumstances connected with the promise to repair, the time intervening from the time complaint was made, etc., to say that the danger was such as a person of ordinary prudence would or would not have been justified in continuing the work. 4 Labatt, Master & Servant (2nd ed.), § 1345, p. 3862; 106 Pac. 917; 88 N. W. 35; 228 Ill. 246. . Since appellee did not assume the risks as a matter of law, it was proper to submit the question of assumption of risk to the jury. 81 Ark. 343.

WOOD, J. The appellee instituted this action against the appellant to recover damages for personal injuries. Among other things he alleged in his complaint that he was in the employ of the appellant in its coal mine No. 6 near Huntington, Arkansas; that he was what was known as a "motor runner," his duties being to operate an

electric motor which was run upon a track in the mine and used for the purpose of hauling empty coal-cars from the bottom of the shaft to "partings" in the entry and there picking up and hauling loaded cars back to the bottom of the shaft. He alleged that there was a defective coupling between the two rear cars in the trip of loaded cars that appellee pulled from the parting to the bottom of the shaft immediately preceding his pulling the trip of empty cars which he was pulling at the time of the collision between the motor and the loaded car; that the loaded cars were coupled by means of a hook and chain; that the hook had been in use for a considerable length of time and had become almost straight, so that it would not hold fast, and that, while the appellee was pulling the trip of loaded cars from the parting to the shaft, the rear car in the trip became uncoupled on account of the defective condition of the hook, and stopped on the track between the parting and the shaft, without the knowledge of the appellee; that the parting boss had negligently permitted the cars coupled with this hook and chain to be included in the trip and negligently failed to inspect said hook and to warn the appellee of its defective condition and the danger incident thereto; that the lights on the motor which appellee was driving were dim and defective in that they did not throw light sufficient to enable the appellee to see any distance ahead while running the motor, and that there were no other lights in the entry to enable the appellee to see the car on the track in time to avoiding colliding with it; that the appellant did not have an inspector in the mine to inspect the track over which the appellee ran the motor to detect any dangers that might arise and to which the appellee would be exposed while in the discharge of his duty as motor runner: that the appellee had requested the chief electrician in the mine and his assistant, who were employees of the appellant, to repair the lights and the electricity on the motor which appellee was driving so that

it would throw the amount of light customary and necessary to enable the appellee to operate the motor; that these servants of appellant promised the appellee to repair the motor, and that, by reason of their negligence in failing to repair the electrical equipment and to furnish an adequate light, the appellee was unable to see the car of coal on the track ahead of him in time to avoid the collision. The appellee charged that, on account of the negligent acts thus enumerated, the appellant had failed to exercise ordinary care to furnish him a reasonably safe place in which to work, and by reason of such failure his injuries resulted. He described the injuries, alleged that they were serious and permanent, and on account of which he had been damaged in the sum of $25,000, for which he prayed judgment.

The appellant, in its answer, specifically denied the allegations of negligence in the appellee's complaint and denied that he was injured at the time and place and in the manner alleged, and set up as affirmative defenses contributory negligence and assumed risk on the part of the appellee.

Under the testimony adduced at the trial the court instructed the jury that the appellee relied upon the negligence of the appellant in two respects; first, that there was a defective hook that straightened out on one of the cars attached to the train of coal cars that appellee was pulling; and, second, that appellant had failed to equip or maintain the motor with sufficient lights to enable appellee to see obstructions upon the track, and that, by reason of these acts of negligence, the collision occurred between the motor car that appellee was operating and a loaded coal-car that had become detached from the train, which collision resulted in the injuries of which appellee complains.

The court instructed the jury that the burden was upon the appellee to prove these alleged acts of negligence, and that, unless he established by preponderance

of the evidence one or both of them, he could not recover. The appellant asked the court to instruct the jury that, under the law and the evidence, the appellee was not entitled to recover, which prayer for instruction the court refused, and the appellant duly excepted to such ruling. The jury returned a verdict in favor of the appellee for $15,000. Judgment was rendered against the appellant for that sum, from which is this appeal.

1. The appellant contends that there was no testimony to sustain the verdict, and that the court therefore erred in refusing its prayer for a peremptory instruction directing the jury to return a verdict in its favor. The first of the alleged grounds of negligence is "that the hook had been in use for a considerable length of time, and by constant use had become almost straight, so that it would not and did not hold fast." The testimony of the appellee concerning this is as follows: "I examined the couplings on that car and found the hitchings were straightened out. By hitching I mean a goose-neck pinned over like that. The goose-neck is hooked to the adjoining car by a link in one end of the car which is dropped down into the goose-neck. The goose-neck was straightened out. When the goose-neck is straightened out the car will come uncoupled." Appellee was asked this question: "Can you tell what straightened it out?" And answered, "No sir." Appellee demonstrated before the jury how the hitching on the end of the draw-bar had straightened up—sometimes the hooks were not fixed properly, and this one was not. In his testimony appellee stated that it was the duty of Frank McCormick to set the cars out when they came out and the hooks were bad. He was the one to whom appellee reported when the cars were in defective condition. He didn't tell McCormick that the car was defective and that it had a straight hook—did not say anything about the defective hook on the car. Appellee, after the occurrence, did switching and helped to clear the wreck.

The above is all of the testimony in the record concerning the alleged defective hook, and it is not sufficient to warrant a finding that the hook had been in use a considerable length of time and by constant use had become almost straight so that it would not hold fast. The burden was upon the appellee to prove the negligence alleged, and he fails to prove any negligence on the part of the appellant in regard to the defective hook. It was the duty of appellant, of course, to exercise ordinary care to furnish appellee a safe place in which, and appliances with which, to do his work. But there was nothing in the testimony adduced by the appellee to prove that the alleged defect in the hook could have been discovered by the appellant by the exercise of ordinary care before, or at the time, the loaded cars were coupled together by this alleged defective hook. The hook was shown to be defective only by the fact that, after the collision occurred, the appellee discovered that the hook on the car with which his motor collided had straightened out. The appellee argues that this physical fact was sufficient to prove that the appellant was negligent. But not so. The appellee does not prove how long the hook had been in use, or that it had become worn and weak by constant use. In other words, for aught that the proof shows to the contrary, the hook, at the time it was used in coupling the car, to all appearances might have been in perfect condition. Or there may have been some latent structural defect that the exercise of ordinary care of inspection would not have discovered. Appellee does not prove that the hook, at the time the coupling was made, was in such condition that the exercise of ordinary care would have discovered that it was defective. There is an utter absence of evidence to prove that the appellant did not exercise ordinary care to inspect the hook before, or at the time, the cars were coupled together, and an utter absence of evidence to show that the appellant was negligent in furnishing a defective hook. *Export Cooperage Co. v. Ramsey,* 133 Ark. 336, and cases there cited.

2. The other ground of negligence alleged in the complaint is as follows: "That the lights on the motor which plaintiff was driving were dim and defective in this, that they did not throw a light sufficient to enable the plaintiff to see any distance ahead while running said motor, and there were no other lights in said entry which would enable the plaintiff to see the car on the track in time to avoid colliding with it." The appellee testified concerning this ground of negligence substantially as follows: "The lights on the motor were dim. There were not any lights on the motor at the time of the collision." Appellee spoke to one Orrick, who was the proper man to speak to in regard to the lights, and also to one Daffron, who was the electrician under Orrick. He told them that the lights were dim, and he would like to get better lights. They told appellee they would try to get him better lights. They hadn't furnished appellee with any better lights up to the time appellee was injured. They didn't tell appellee how long it would be before they would get the lights. The injury occurred "two or three days, and maybe a day," after they told appellee they would get better lights. Appellee made complaint to them "about two or three or four or five times—something like that." If there had been the proper light, appellee could have seen the car before he got to it, and had plenty of time to stop. There were no lights on the first west entry at the time appellee was injured, between the doors and the first west door. Appellee had been operating the motor over two years—maybe three years —before, and they had the same lights on it all the time he was operating it; one at the front and one at the back. Appellee had complained to the electrician about the lights four or five times within the three days before he got hurt. He told him the lights were dim and getting dimmer all the time; that "they were not getting the proper amount of juice. The joints kept getting worse. They were getting dimmer a month or two and getting worse all the time. Sometimes the head of it would get

to where it would pop kind o' like a pistol.'' The accident happened within a day or two after appellee made complaint. Appellee was asked why he didn't complain about the lights growing dim two or three months before, when he observed it, and answered that he had said something or other to him (the electrician) about the joints being fixed. He went and told him about the joints being fixed and complained to him about the lights being dim—about the joints. When the motor was operating the lights were dimmer, and when the motor was standing still the lights were bright. Appellee was asked whether the same voltage went into the lights as in the motor resting on the rails, and answered that they couldn't get the same juice because where the rail was so small it wouldn't carry it. The appellee was asked what he meant by the ''joint'' of the lights, and answered, ''A short piece of wire they used in different places,'' and demonstrated before the jury what he meant. There was a clamp like a railroad wire where you put a splice in it, and this wire is in under and connected with the rail on which the motor runs. The electricity comes down through the wire, and when these wires get loose there isn't much motive power. The juice would not go through the wire. The joints had been getting loose that way for two or three months. They were getting bad— getting worse all the time. They were not dim that way when appellee first came back from the war. Appellee could see further then than he could at the time of the injury. There was one light right near the parting— they called it on the parting. By that light the boys could see to work at that place.

Witness Orrick testified that he was the electrician for the appellant, and, among other things, he explained the system by which the mine was furnished with lights and power to run the motor as follows: ''The system was what you would call a continuous return, because we had a continuous rail strung along by the side of the track, and this was a copper wire here, and then the

rails at the joints had iron fishplates under them; strips of copper wire under the fishplates and bolted down with the fishplates, and about every 200 or 300 feet there was wire running off under these fishplates and connecting to this continuous wire by the side of the track, which made a continuous ground metallic circuit. The wire was used to conduct the current from the return of the motor. The wire conducted the electricity from the motor by coming in contact with the wheels of the motor. If wire got covered up with dirt and coal it would interrupt the current some and would have effect on the lights. If there was a great deal of dirt the lights would get dimmer or go out, depending upon the amount of dirt on the rail. On cross-examination the witness was asked the following question: "You have seen electric bulbs —be sitting in a house, and the lights almost go out, and all that would be left would be a red wire in there, and it didn't issue any light hardly; what is the cause of a condition of that kind?" And he answered, "Reduced voltage." He was then asked: "Could that same condition exist with reference to headlights on the motor and at the same time not affect the operation of the motor?" And answered, "Yes sir." He further testified concerning the promise to repair, that the appellee had complained to him "about the trouble on the motor in July, and it was repaired"—that the lights were incandescent lights, and when broken they would be repaired; that no report was ever made by the appellee to him that the lights were constantly growing dimmer; that he put lights in the entry anywhere the plaintiff would ask for them.

The testimony of the appellee tended to prove that he was employed by the appellant as a "motor runner." His duties as such were to operate the motor which was run by electricity, and this motor pulled empty cars from the bottom of the shaft to what is known as the parting in the entry, and loaded cars from the parting back to the bottom of the shaft. While appellee was performing this work, one of the loaded cars in the string of cars

appellee was pulling out of the parting uncoupled itself, without the knowledge of the appellee, and stopped in a swag in the track along the entry. When appellee was returning with a string of empty cars his motor collided with this detached loaded car. At the time of the collision appellee was sitting sidewise. He demonstrated to the jury the position he was in. He stated he had his head turned back toward the entry. It was dark there. He could see ten or fifteen, or maybe twenty feet, ahead, but couldn't see good. He was maybe twenty feet from the car with which he collided when he first saw it. The motor was running at full speed, about fifteen miles an hour. He did all he could to prevent the motor from colliding with the car after discovering it. He detailed the efforts he made, and stated that was the proper way to handle the car in an emergency of that kind. The motor struck the loaded car with full force, which caused some of the coal with which the car was loaded to strike the appellee in the back, injuring him severely.

There was testimony to the effect that the appellee had worked in and about the mines in almost every capacity ever since he was ten or eleven years old, and was experienced in the line of work he was performing. It was his duty as a "motor runner" to watch out for cars or for any other obstruction on the track. At the time of his injury appellee was running at the same rate of speed that he had been running the motor for two or three years. The speed could have been reduced and the motor run slower by putting the motor on resistance, but that had never been done.

Now, we are convinced from the above testimony that the issue as to whether appellant was negligent in failing to exercise ordinary care to provide sufficient lights to enable the appellee to perform his duties in safety, and the issue as to whether appellee had exercised ordinary care for his own protection and safety, and likewise the issue as to whether or not the appellee assumed the risk, were all issues for the jury. The court

therefore did not err in refusing appellant's prayer for a directed verdict in its favor.

The appellant does not contend here that there was any error in the instructions of the court in submitting the issues of negligence and contributory negligence to the jury. It only contends that there was no evidence to warrant the submission of these issues to the jury, and further contends that the court erred in granting the appellee's prayer for instruction on assumed risk as follows:

"No. 8. If you find that it was proper for Lockhart to call upon the electrician to repair the electric equipment, in case it got out of order, and that he called upon said electrician to make such repairs, and the electrician in charge had the authority to make the repairs, without consulting the pit boss, and that the said electrician failed to make such repairs, or to have them made, within a reasonable time thereafter, and Lockhart continued to work, relying upon the promise that the same would be repaired, and that a reasonably prudent and cautious person would have done so, then the plaintiff would not be guilty of an assumed risk."

The appellant now contends that the above instruction is fatally defective because it assumes that there was a promise to repair. While the definite article "the" before the word "promise" would justify that construction if especial emphasis were laid on the word "the," yet it is obvious that, when the entire phraseology of the instruction is considered, and when the instruction is also considered in connection with instruction No. 7, given at the instance of the appellant, *

*7. The court instructs you that the mere fact, if a fact, that the plaintiff, while in the employ of the defendant, made complaint to the electrician or to his helpers with reference to the lights being dim on the car, but that no complaint was made to the pit boss, who was the agent in charge of the underground operations of said mine, then, under the law, such a complaint would not relieve the plaintiff of having assumed the risk of any injuries arising from the defective or dim light."

the trial court did not intend to assume that a promise of repair had been proved by the undisputed evidence, and did not intend to tell the jury to treat this as an established fact. The word "the" in connection with the other words in which the sentence is couched should be treated as a mere expletive used rather for euphony than for emphasis. If it had been omitted, or the indefinite article "a" substituted in its stead, the sentence and the sense would have been complete and would have as clearly expressed the purpose which the trial court evidently had in mind. Such purpose was to submit to the jury the issue as to whether or not it was proper for the appellee to call upon the electrician rather than the pit boss to repair the electric equipment and to tell them, if such was the fact, and if the electrician had the authority to make the repairs, and promised to make them, and failed to do so within a reasonable time thereafter, and if appellee continued to work relying upon such promise, then he did not assume the risk.

It occurs to us that, when the instruction is viewed in the light of the evidence, it should be read as though the subjunctive "if" with which the instruction begins should be treated as qualifying each distinct proposition embraced in the instruction, thus, in effect, telling the jury that the existence or nonexistence of such proposition as a fact was submitted for their determination. If, at the time the instruction was offered, counsel for appellant conceived that the use of the word "the" had the effect of assuming that there was a promise of repair and that it was the purpose of the court to invade the province of the jury and to treat as a fact established an issue that was open for dispute, as they now contend was the effect of the instruction and the purpose of the court, then certainly they should have notified the trial court of their insistence by a specific objection. If counsel had done so, doubtless the court would have changed the phraseology by using the indefinite article, or by omitting the article entirely, which change would have cor-

rected the instruction to meet appellant's view. This is peculiarly a case where it was the duty of appellant to lay its finger upon the specific word which it now contends deprived them of the right to submit an important disputed issue of fact to the jury. *Pekin Stave Co.* v. *Ramey,* 108 Ark. 490; *Rittenhouse* v. *Bell,* 106 Ark. 321, and cases there cited. See also *Castevens* v. *State,* 79 Ark. 455; *Pettus* v. *Kerr,* 87 Ark. 396; *St. Louis, I. M. & S. Ry. Co.* v. *Sparks,* 81 Ark. 187; *A. L. Clark Lumber Co.* v. *St. Coner,* 97 Ark. 358; *Strickland* v. *Strickland,* 103 Ark. 183, and numerous other authorities cited in 1 Crawford's Digest, Appeal and Error, page 166, § 94 (4).

Instruction No. 8 was predicated upon the evidence adduced on the issue of assumed risk, and correctly declared the law in submitting that issue according to numerous decisions of this court. In *St. L. I. M. & S. Ry. Co.* v. *Holman,* 90 Ark. 555-565, we said: "The effect of a promise to repair by the master, and of the continuance in his service by the servant, in reliance upon the promise, is to create a new stipulation whereby the master assumes the risks impendent during the time specified for the repairs to be made. Where no definite period is specified in which the given defects are to be remedied, the suspension of the master's right to avail himself of the defense of assumption of the risk by the servant continues for a reasonable time. No matter how obvious the defects or how imminent the perils therefrom, the servant, pending the promise of the master to repair, does not assume the risk of the given defects by continuing in the master's service in reliance upon his promise. For, as was said by the Supreme Court of Illinois in *Swift & Co.* v. *O'Neill,* 187 Ill. 337: 'By the promise of the master a new relation is created between him and the employee whereby the master impliedly agrees that the servant shall not be held to have assumed the risk for a reasonable time following his promise.' "

In the above case we also quoted from Judge Cooley as follows: "If the servant, having a right to abandon

the service because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless, or until, he makes his assurances good. Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume the risk." Cooley on Torts, p. 1157; see also *Markham* v. *Three States Lumber Co.*, 88 Ark. 34, and numerous authorities cited in the above cases. There are many subsequent cases to the same effect.

The doctrine of the above cases is applicable to the facts of this record. It was an issue for the jury, under the evidence, as to whether or not there was a promise to repair and whether or not the appellee continued in the service of the appellant in reliance upon such promise. The jury has resolved these issues against the appellant, and its verdict is conclusive here.

3. While the appellant objected to the ruling of the court in refusing its prayer for a directed verdict in its favor, it did not pray for an instruction telling the jury that there was no evidence to sustain the allegation of negligence as to the defective hook, nor did it object specifically to that part of instruction No. 1 in which the court told the jury that this was one of the alleged issues of negligence to be considered by them. The evidence did not warrant the submission of this issue, but it was submitted in an instruction which also submitted the issue as to whether or not appellant was negligent in failing to equip and maintain the motor with sufficient lights. The latter issue, as we have seen, was proper to be submitted to the jury under the evidence, and was correctly submitted. Since the appellant did not make a specific objection to the court's instruction No. 1, on the ground that one of the issues submitted was not sustained by the evidence, and did not pray for an instruction specifically telling the jury that there was no testi-

mony to sustain this allegation of negligence, the appellant is not in an attitude to complain here because the court erred in failing to eliminate that issue from the consideration of the jury. The appellant made no such request. See *Darden* v. *State,* 73 Ark. 315; *Bruder* v. *State,* 110 Ark. 402-411.

The record presents no reversible error, and the judgment must therefore be affirmed. It is so ordered.