## MILLER v. STATE.

### Opinion delivered April 11, 1910.

1. EVIDENCE—OPINION OF MEDICAL EXPERT.—Where a witness, by experience and education, has gained special knowledge and skill relative to matters involving medical science, he is entitled to give his opinions thereon. (Page 543.)

2. SAME—OPINIONS OF NONEXPERTS.—The opinions of nonexpert witnesses may be given in evidence in cases where, from the nature of the subject, the facts cannot be otherwise properly presented to the jury so as to enable them to draw an intelligent conclusion. (Page 544.)

3. CONTINUANCES—DISCRETION OF TRIAL COURT.—The denial of a continuance in a criminal case will not be ground for reversal where it does not appear that injustice was done. (Page 545.)

4. SAME—DENIAL—PREJUDICE.—The denial of a continuance asked on account of the absence of witnesses was not error where the accused had ample time to take the testimony of such witnesses and made no effort to do so. (Page 546.)

5. SAME—GOOD FAITH OF APPLICATION.—While the trial court may not usurp the province of the jury in passing upon the credibility of witnesses, it has the right, in passing upon an application for continuance, to consider the facts relative thereto in order to determine whether the application was made in good faith or merely for delay. (Page 547.)

Appeal from Poinsett Circuit Court; *Frank Smith*, Judge; affirmed.

*Going & Brinkerhoff*, for appellant.

A continuance should have been granted. 34 So. 479; 42 So. 167; 60 S. E. 211; 83 S. W. 690; 81 Am. St. 150; 37 So. 809; 88 S. W. 107; 86 S. W. 327; 65 Ga. 332; 8 Ia. 536; 60 Ark. 564. Due diligence was used to secure the attendance of the witness. 34 So. 479. The State failed to prove the *corpus delicti.* 60 S. W. 771.

*Hal L. Norwood*, Attorney General, and *W. H. Rector*, Assistant, for appellee.

It was not error to refuse the continuance. 41 Ark. 62; 40 Ark. 114; 26 Ark. 323; 54 Ark. 243; 41 Ark. 153; 51 Ark. 167; 62 Ark. 543; 34 Ark. 26; 76 Ark. 290; 70 Ark. 521; 71 Ark. 62; 26 Ga. 271; 87 Ia. 306; 82 Ind. 580; 89 Ind. 187; 33 La. Ann. 781; 106 Ga. 400; 116 Ga. 583; 115 Mo. 471; 9 Wash. 204; 54 Ark. 243; 77 Ark. 146; 26 Tex. App. 443; 23 *Id.* 388; 30 *Id.* 64. The *corpus delicti* was proved. 34 Ark. 720; 48 Ind. 109; 171 Mass. 461; 14 Nev. 79; 101 Pa. 38; 68 L. R. A. 33.

FRAUENTHAL, J. Defendant, C. M. Miller, was arrested on June 18, 1909, charged with the killing of A. Flood. A few days thereafter, upon a preliminary hearing by the coroner, he was committed to await the action of the grand jury. At the following October term of the circuit court he was indicted by the grand jury of Poinsett County, charged with the crime of murder in the first degree by killing A. Flood on or about June 10, 1909. He was tried by a petit jury of said county, and was convicted of the crime of murder in the first degree, and now presents to this court this appeal, to obtain a reversal of that conviction.

The testimony which was adduced upon the trial of the cause established the following facts: A Flood was a fisherman, unmarried and about fifty or sixty years old, and for the past ten

or twelve years he had made his home up and down the St. Francis and Little Red rivers, in Arkansas. For about one year and a half prior to June 4, 1909, he had lived on the banks of the St. Francis River in Poinsett County, about twelve miles from Marked Tree. Here he had built a houseboat, and had accumulated some personal property, consisting of a gasoline and other boats and the trappings of a fisherman, in addition to his immediate personal effects. He had also accumulated about $515 in money, which he kept upon his person in a pocketbook. His nearest neighbor lived about one-half mile distant from him, and he mingled freely and frequently with the people in that community, as well as going frequently to Marked Tree, the nearest town to his home. He had a brother, who lived in Randolph County, with whom he communicated and corresponded regularly, writing him as often as once each month; and his brother received a letter from him shortly after June 4, which had been written just prior to that date.

About April 1, 1909, Flood met the defendant at Lake City for the first time. The testimony does not indicate how long defendant had been at that place, or where he came from; but he was out of employment and without any occupation; and Flood invited him to go to his home and join him in his fishing business. Defendant stated afterwards to a witness that when Flood agreed to take him to his home he had $5.30, and this was all the property he possessed. He went with Flood, and the two lived in the houseboat alone from that date until June 4, 1909, when Flood disappeared.

About one week prior to June 4, defendant said to a witness that he would own all of Flood's outfit in about a week, and told him to keep it quiet and say nothing about it. A witness testified that he was in company with defendant and Flood on June 4, and left them together at the houseboat about 4 P. M. of that day. Another witness testified that Flood had made an engagement to meet him at the witness' home on the following day with reference to a business transaction; and it appears from the testimony that Flood had made an agreement with another party to see him some days later relative to some business matters. But on June 4, 1909, Flood disappeared, and he is not known to have been seen by any one since that date.

On the following day defendant went to one of the neighbors in order to obtain his assistance in running the gasoline boat up the river to Marked Tree, and stated to him that he had bought all of Flood's property for $225; that on the evening before Flood had "skiddooed," that he had met a man on the river who desired his services in building a boat, and that Flood had gone with him to Madison, a place some thirty-five or forty miles distant; that upon leaving with this man Flood had sold his outfit to defendant, upon which defendant paid him $90 at that time. At another time defendant said that Flood had gone to Memphis.

On the day following Flood's disappearance (June 5, 1909), defendant took his neighbor and a number of persons on the gasoline boat to Marked Tree, and stated that he wanted to get there before the bank closed, and that he was expecting money to be sent him. They did not get to Marked Tree until after the bank had closed, and the parties remained there over night. About 10 o'clock on that night defendant was in a saloon with one of the parties and suddenly went out of the back door, and soon returned and exhibited a large roll of paper money, seemingly several hundred dollars. He stated that when he went out of the saloon a man spoke to him and asked him if his name was Miller, and upon answering that it was the man said that he was the person he was looking for, and thereupon paid him the money.

On June 7 defendant went to Memphis, where a reunion of the Confederate Veterans was in session, and remained in that city until June 10. On that day he met a man in a saloon by the name of George Ashmore, who was then a stranger to him. He introduced himself to Ashmore as Flood, and requested him to go with him to his fishing place near Marked Tree, and exhibited to him his money and told him that he, too, could make money at fishing. This man went with him, and upon his return from Memphis defendant introduced the man as Bob Horton. The two parties remained at the houseboat until about June 18, when defendant was arrested.

Upon the day before the arrest, there were found a number of parts of a human body about two hundred yards below the houseboat, which had caught in the drift. These pieces included

both elbows, parts of both legs, some parts of the abdomen and one thigh. Nearer to the houseboat there was discovered a log upon which were a number of hacked places, and in which pieces of flesh and bones were found, and a number of human hairs, and a piece of badly decayed flesh was found near the log. There was also found a piece of a leg and a human foot. The foot thus found was deformed and had a peculiar knot upon the instep. When Flood was about thirty years old, his right foot was injured, so that the instep was broken, and a peculiar knot had grown or risen upon the upper part of the instep. Upon this account his foot was deformed, and he walked as though he was crippled. The part would become sore and irritated at times, and would require the attention of a physician. Dr. J. A. Forgus, who was a graduate of a school of surgery, and who had practised surgery and medicine for a great number of years, waited upon Flood as a physician, and not long before his disappearance he had dressed and attended to his deformed foot. He testified that the dismembered foot that was found was the foot of Flood, and that he recognized it, and that he could and did identify it as Flood's foot on account of its peculiar deformity.

At the time of defendant's arrest, these parts of a human body were shown to him, and he was asked if he knew anything relative to them or the whereabouts of Flood. He made no answer and no statement, but only hung his head. Later, there was found upon the defendant Flood's watch and $91.95, in money. In the houseboat all of Flood's clothes and his shoes and personal effects were found. Amongst these was a suit of clothes that he had worn on June 4th, the day he disappeared, and his spectacles. Defendant had taken possession of all these clothes and personal effects, as well as of the houseboat and the boats which had been owned by Flood, and claimed that he had acquired them from Flood.

The floor of the houseboat appeared to have been recently scrubbed until the fibers of the wood stood out; but deep stains as of blood appeared upon the floor, and splotches of dry blood were found upon the bedstead. Some days later, the lid of the heating stove in the houseboat was raised, and gave forth a stench and odor as of burned flesh. The ashes of this stove

were examined, and among them were found a number of pieces of charred bones and a number of human teeth.

A fellow prisoner in the jail testified that sometime after defendant had been placed in jail he made a written statement relative to the killing of Flood in which he set forth that some one other than himself had done the killing, and he said that he desired to get the statement published in some paper, so that his relatives might see it and come to his assistance. This fellow prisoner also testified that later defendant told him that he had .written a letter to a relative, and had given it to a colored woman, who had visited a colored prisoner in the jail, for her to mail, and that he was fearful that the letter might fall into the hands of the officers, and stated that that if it did it would convict him of the murder of Flood.

We have thus set forth in a general way the facts and circumstances adduced in evidence upon the trial of this case. The testimony introduced is somewhat voluminous, and, after having carefully examined it, we are convinced that there was sufficient evidence to sustain the finding of the jury that the parts of the human body which where found near Flood's house-boats were the dismembered remains of Flood, and that defendant was guilty of killing him as charged in the indictment. Under these circumstances, and as has been repeatedly held by this court, the verdict of the jury upon these questions of fact becomes conclusive upon the hearing on appeal.

Upon the trial the court gave full and correct instructions to the jury which covered every phase of the case. Defendant was represented in the lower court and in this court by able counsel, and he has suggested no error in any of these instructions. Nor is it suggested that the court failed to give any instruction which a fair trial of the case required. We have carefully examined all the instructions, and we find that they correctly declare the law. By them the jury were fully instructed as to every ingredient of the crime and as to every phase of the case.

It is urged by counsel for defendant that error was committed by the lower court in permitting certain witnesses to testify that the parts of the body found were parts of a human body; that the stains on the floor of the houseboat were blood stains, and that the hairs found upon the log were human hairs.

This contention is made upon the ground that this testimony was but the opinions of the witnesses, and for that reason was inadmissible. This testimony was given by two physicians, who had been educated at medical schools, and who had had extensive experience in their practice of medicine and surgery, as well as by other witnesses. The physicians actually saw these objects themselves, and they, as well as the other witnesses, first named and described these objects to the jury as well as they could. The two physicians are presumed to understand the questions pertaining to their profession, and to be expert upon those questions, and were competent to give their opinions relative thereto. The objects observed by them, and about which they testified, were within the line of their professional experience, and as to these they enjoyed a means of special knowledge. When a witness has, by experience and education, gained special knowledge and skill relative to matters involving medical science, he is entitled to give his opinion thereon. 1 Greenleaf on Evidence, § § 430c, 441b; 5 Enc. Ev. 534.

Furthermore, the opinions of ordinary witnesses, derived from observation, may be given in evidence in cases where, from the nature of the subject, the facts can not be otherwise properly presented to the jury. "Where the facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed, to a certain extent, to add his conclusions, judgment or opinion." 6 Thompson on Negligence, § 7750.

Frequently, the opinion of a witness as to the appearance of an object he has seen is the best and only evidence obtainable, and therefore such statements of the witness are admissible. 5 Enc. Ev. 677; Lawson on Expert & Opinion Ev. (2d Ed.) 512. Thus, it has been held that a witness may testify that spots and spatters on a thong were blood; and that blood seen by the witness was fresh blood. *Greenfield* v. *People*, 85 N. Y. 75; *State* v. *Bradley*, 67 Vt. 465; *People* v. *Loui Tung*, 90 Cal. 377. In the case of *Commonwealth* v. *Dorsey*, 103 Mass. 412, a witness was permitted to testify that certain hairs were human.

We are therefore of the opinion that no error was committed in allowing the introduction of the testimony complained of.

It is earnestly insisted by counsel for the defendant that the court erred in refusing to continue the trial of the case upon the motion for a continuance made by the defendant. It has been uniformly held by this court that the continuance of a trial in criminal as well as civil cases is within the sound discretion of the trial court, and that the refusal of the trial court to grant a continuance will never be a ground for a reversal unless it clearly appears that there has been an abuse of such discretion, and that it manifestly operates as a denial of justice. It has been said by this court that, to warrant a new trial for a refusal to grant a continuance, "it must be a flagrant instance of an arbitrary and capricious exercise of power operating to the denial of justice." The trial court is, from personal observation, familiar with all the attending circumstances, both of the case and of the motion for continuance. He has the best opportunity to form a correct opinion upon the matters presented; he is in a position to be better enabled to determine whether sufficient time has been had to obtain the desired testimony; he is more fully advised as to whether the application for a continuance is made in good faith or merely for delay, and as to whether or not there is a probability of the existence of the witness or the testimony that is claimed to be desired. In no case, therefore, will the exercise of the discretion of the trial court in a matter of continuance be reviewed upon appeal where it manifestly appears that justice has been done without sacrificing the rights of the defendant. *Dunn* v. *State,* 2 Ark. 229; *Stewart* v. *State,* 13 Ark. 720; *Golden* v. *State,* 19 Ark. 590; *Thompson* v. *State,* 26 Ark. 323; *Watts* v. *Cohn,* 40 Ark. 114; *Loftin* v. *State,* 41 Ark. 153; *Jackson* v. *State,* 54 Ark. 243; *Price* v. *State,* 57 Ark. 165; *Kitts* v. *State,* 70 Ark. 521; *Puckett* v. *State,* 71 Ark. 62.

In the case at bar defendant was arrested on June 18th, charged with the commission of this crime. In a few days thereafter a preliminary hearing was had, and he was committed to jail. At the following October term of the court he was indicted, and on October 20, 1909, he appeared in said court in person and by his attorney, and by the consent of all the parties

the trial of the cause was set for October 25th. During all the time from June 18th, he knew of the crime that was charged against him, and a few days thereafter, by virtue of the preliminary hearing, he knew of the facts and circumstances by which the State would attempt to establish his guilt. At no time did he make any suggestion that he could obtain the testimony which is now set out in his motion for a continuance until the very day of the trial. On October 20th he and his attorney agreed that the trial should be set for October 25th, and at that time no suggestion was made that this testimony was in existence or would be desired. Upon the day of the trial, defendant mentioned for the first time the existence of this alleged testimony. He then filed a motion for a continuance, in which he set out that he desired to obtain the testimony of Pat Miller, T. T. Moore and Will Barnett. He claimed that he could prove by Miller that Flood had formerly lived in Randolph County, and at one time had disappeared for six months and afterwards had returned; that by this witness he would also show that Sherman Flood, the brother of A. Flood, knew this. Upon the trial of the case Sherman Flood appeared as a witness and testified that he did not know and never had heard of Pat Miller, and that his brother had never disappeared at any time prior to June 4, 1909.

By the other witnesses defendant claimed that he could prove that one of them had borrowed from him $300 and had, on June 5, 1909, come to Marked Tree and paid this money back to him; and that the other witness knew that he had loaned this money. He stated that Miller resided at Paragould, that Moore resided in Memphis, Tenn., and Barnett in Caruthersville, Mo.

Defendant had made no effort to take the testimony of the witnesses who resided without the jurisdiction of the court, and made no application to the court at any time for that purpose until the case was called for trial. He did not have a subpœna issued for Miller until the night of October 22. He never made a suggestion that he desired to or could obtain the testimony of any such witnesses when, on October 20, he and his attorney agreed that the trial of the cause should be set for October 25th. From June 18th until the meeting of the court in October he

had an opportunity to employ counsel, and his subsequent employment of counsel showed that he was able to procure counsel; and, while it is claimed by his attorney that he was not employed until during the session of the court, we do not think that the court abused its discretion in finding that it was not shown that there had been a proper exercise of diligence to obtain this testimony.

Furthermore, the circumstances attending the application for continuance raise just doubts of the good faith of the defendant in making it, and we cannot say that the court abused its discretion in finding that it was made for delay rather than for the purpose of securing testimony. While it is not the province of the court to usurp the province of the jury by passing on the credibility of witnesses, nevertheless the court has the right, in passing on the matter of the application for a continuance, to consider the attending facts relative to the motion for continuance, in order to determine the probability of the existence of such witnesses and testimony, and thus to pass upon the question as to whether or not such application for continuance is made in good faith or merely for delay. *Lane* v. *State,* 67 Ark. 290. Of this the trial court is preeminently able to judge, and therefore it should not be said that the discretion of the trial court has been flagrantly abused in such a matter unless it manifestly appears that an injustice has operated thereby to the rights of the defendant.

We have carefully examined all the testimony in this case and the circumstances attending this application for continuance and its refusal, and we cannot say that the court has abused its discretion in overruling the motion of the defendant for a continuance. Upon the other hand, upon a full and careful examination of all the testimony and of the circumstances attending the trial, we are convinced that the defendant has had a full, fair and impartial trial; and it does not manifestly appear that an injustice has been done to the defendant by reason of the refusal to grant him the continuance.

The judgment is therefore affirmed.

BATTLE, J., dissents on the ground that continuance should have been granted.