## PREWITT *v.* STATE.

### Opinion delivered October 24, 1921.

1. CRIMINAL LAW—FAILURE TO DEFINE REASONABLE DOUBT.—A defendant who has not asked a correct instruction defining reasonable doubt is in no position to ask for a reversal for a failure to define that term.

2. CRIMINAL LAW—CREDIBILITY OF WITNESS—INSTRUCTION.—An instruction in a criminal case that if the jury believe that any witness has wilfully sworn falsely to any material fact in the case they may reject his whole testimony, or may reject that which they find to be false and accept the remainder, is erroneous in so far as it authorizes the jury to reject any testimony which they believe to be true.

3. CRIMINAL LAW—EVIDENCE—CONVERSATION BETWEEN THIRD PERSONS.—Where the defendant in a prosecution for murder sought to establish the plea of self defense, and testified to the effect that an altercation grew out of a misunderstanding on deceased's part as to what the defendant had said to his wife about deceased's mother, which was repeated by his wife to deceased's

mother, it was competent to prove what defendant's wife said to deceased's mother as tending to corroborate defendant's testimony in regard to his conversation with deceased; no one else having heard the latter conversation.

4.   CRIMINAL LAW—EVIDENCE — APPEARANCE OF ACCUSED.— Where, after the killing, defendant went to a physician's office and requested him to go to deceased's relief, testimony of the physician as to the defendant's appearance at that time was incompetent.

5.   CRIMINAL LAW—EVIDENCE.—It was error in a murder case, to exclude testimony of a witness, who saw defendant immediately after the killing, that the expression on defendant's face at that time indicated no anger or resentment, but only fright and fear.

6.   HOMICIDE—ARGUMENTATIVE INSTRUCTION—SINGLING OUT FACTS.— An instruction in a murder case that, in deciding the situation of the parties, the jury should take into account "their threats, if any, and their relative strength and power, because, in a contest between a powerful individual and a weaker, the necessity of taking life in self defense will be more apparent and easily discoverable," was properly refused as being argumentative and as singling out the particular circumstances named.

Appeal from Lincoln Circuit Court; *W. B. Sorrels,* Judge; reversed.

*Arthur Johnson* and *Williamson & Williamson,* for appellant.

1.   The verdict is not supported by the evidence. This court is committed against the scintilla rule, and the rule calling for a refusal of a new trial where there was any evidence whatever, however weak, to support the verdict.   34 Ark. 632; 85 *Id.* 360-362; 97 *Id.* 156, 159; 56 *Id.* 8, 17; 49 *Id.* 364.

2.   Any declaration of law which will permit a conviction of murder in the second degree without proof of malice is reversible error.   141 Ark. 57; 82 *Id.* 545.   No killing can be murder unless done with malice. 35 Ark. 585; 141 *Id.* 63.   It must be proved by substantial evidence and beyond a reasonable doubt.   The State cannot rely upon inferences or conclusions to establish malice. 100 Ark. 354; 71 *Id.* 460; 49 *Id.* 364; 96 *Id.* 52; 119 *Id.* 85; 69 *Id.* 189; 76 *Id.* 515; 141 *Id.* 57; *Id.* 11, 12; 38 *Id.* 221. Implied malice can only arise where no considerable provocation appears, or where all the circumstances of the

killing manifest an abandoned and wicked disposition. C. & M. Dig. § 2341; 34 Ark. 640; 17 Cyc. 754; Id. 817; 100 Ark. 354. Express malice, see C. &. M. Dig. § 2340. Must be proved. 66 Ark. 646; 9 Am. & Eng. Enc. of L. 587; 1 Bishop, Crim. Law § 868; 1 McClain, Crim. Law § 340; 73 Ark. 315, 319; 110 Id. 402; 75 Id. 142; 74 Id. 262.

3. The absence of any motive for the killing save that of self defense alone, is a strong circumstance in favor of innocence which must be considered if justice is to be done. 93 Ark. 323; 109 Id. 391; 138 Id. 517; 71 Id. 117.

4. Proof of what the conversation was between appellant's wife and the mother of deceased, which led to the difficulty between appellant and deceased, was relevant and material to appellant's defense, and it was reversible error to exclude Mrs. Harding's testimony. 1 Wharton on Evidence, §§ 20, 21; 49 Ark. 542; 58 Id. 233; 241; 71 Id. 112, 117; 43 Id. 99; 114 Id. 275; 109 Id. 391; 29 Id. 262; 14 Id. 555, 561; 43 Id. 99, 104.

It was likewise error to exclude the testimony of the witness Spyker concerning the appearance of the appellant immediately following the shooting, and also the testimony of Dr. Hutchinson on that point.

5. The court erred in excluding testimony offered to show the actual character and disposition of the deceased. Wigmore on Evidence, §§ 52, 53, 1908-1986; 3 Id. pp. 2627, 2629, 2630, 2644, 2645-46; 29 Ark. 262-263; 34 Id. 372; 47 Id. 187; 69 Id. 149; 72 Id. 439; 79 Id. 601; 82 Id. 597; 85 Id. 381; 108 Id. 129; 100 Id. 564; 115 Id. 501; 98 Id. 430; 95 Id. 241; Carr v. State, 147 Ark. 524; 132 Id. 504.

6. Instructions 1 and 3, to the effect that the burden was on the State to prove every material allegation of the indictment beyond a reasonable doubt, etc., undoubtedly stated the law, and should have been given. 109 Ark. 516. It constitutes reversible error to omit a definition of reasonable doubt, in charging the jury. 69 Ark. 449. Instructions 10 and 17 on the issue of self defense

is in accordance with the law as declared by this court in *Palmore* v. *State,* 29 Ark. 267. Also instruction 12, to the effect that if the fatal shot was fired under the belief, although a mistaken belief, that it was necessary in order to protect himself from serious bodily harm, defendant should be acquitted, was the law as declared by this court. 131 Ark. 538. Instruction 16 as to the purpose for which proof was admitted as to the reputation of deceased, should have been given. 85 Ark. 380.

7. The court erred in its charge to the jury in giving § 2374, C. & M. Digest, in part only. 85 Ark. 48; 13 *Id* 360; 54 *Id.* 588; 55 *Id.* 397.

Instructions on the subject of justifiable homicide which are not qualified so as to show the right of the accused to act upon the circumstances as they appeared to him, as a reasonable person, are erroneous. 67 Ark. 594, 599. Instruction No. 9, given by the court, amounted to a peremptory instruction to convict, the effect of it being to tell the jury to disregard all the evidence save the actual fact of the shooting. 85 Ark. 52; 67 *Id.* 599. Correct instructions given at appellant's request, did not cure the error. 55 Ark. 393; 57 *Id.* 203; 59 *Id.* 52; 85 *Id.* 52; *Id.* 214, 217; 93 *Id.* 564, 573.

8. No definition of murder in the second degree, with instruction thereon, was given. 38 Ark. 221.

On appeal from the order, *nunc pro tunc,* correcting the record:

The proceeding to correct the record was material to the appellant, and he was entitled to be present at the time in person. The court ought to have continued the hearing on the motion on account of his illness, and to proceed in his absence was reversible error. 143 Ark. 543; 103 *Id.* 4; 21 *Id.* 226; 35 *Id.* 118; *Id.* 588; 50 *Id.* 499.

*J. S. Utley,* Attorney General, *Elbert Godwin* and *W. T. Hammock,* Assistants, for appellee.

1. The evidence supports the verdict. Malice, an essential element of murder in the second degree, may be either express or implied. C. & M. Digest, § 2340. Ac-

tual intent to take life is not a necessary element in the crime. 55 Ark. 556. There was no legal provocation for the killing. Abusive words will never justify taking human life. 70 Ark. 272; 77 *Id.* 464; 131 *Id.* 487. Motive for the killing was clearly shown.

2. Mrs. Harding's testimony was not admissible. The alleged conversation between Mrs. Hastings and appellant's wife was not in his presence, and it is not claimed that any threats by either deceased or appellant towards the other were communicated by that conversation.

3. The testimony as to appellant's appearance after the shooting was not competent.

4. There was no error in refusing to permit witnesses to testify as to their personal knowledge relative to the character of the deceased. Reputation was the proper inquiry, and whether it was known to the accused. 1 Greenleaf on Ev. § 14, p. 42; Underhill on Ev. §§ 324, 325; 1 Wharton, Crim. Ev., 246; 29 Ark. 248; 100 *Id.* 561; *Trotter* v. *State,* 148 Ark. 466.

5. We do not think the instructions 4 and 20, to the refusal of which the appellant objects, gave a clear definition of a reasonable doubt. The court is not required to instruct as to reasonable doubt on its own motion. 86 Ark. 456.

It is not obligatory upon the court to instruct upon the credibility of witnesses. 109 Ark. 383.

Instructions 10 and 17 were properly refused, as they omitted the necessary element that the accused must have thought the killing necessary in order to protect his own life or to save himself from great bodily harm. 93 Ark. 409. Moreover instruction 17 was not applicable to the testimony in the case. Appellant's objections to instructions were general. He should have made specific objections. 101 Ark. 95.

SMITH, J. Appellant was tried under an indictment charging him with the crime of murder in the first de-

gree, alleged to have been committed by shooting one Morris Hastings. He was convicted of murder in the second degree, and given a sentence of ten years in the penitentiary, and has appealed.

The facts in regard to the killing are substantially as follows: The appellant, who will hereinafter be referred to as the defendant, and Hastings, who will be referred to as the deceased, had always been on friendly terms and had frequently hunted together. Defendant was thirty-eight years old, and at the time of the killing was under treatment by a physician for hernia, and was a much smaller man than deceased, who was twenty-three years old, six feet tall, and of athletic build. The killing occurred about nine o'clock Thursday morning, February 17, 1921, in the little town of Grady, in Lincoln County, where both parties had lived for a number of years.

According to defendant, he had bought a bird dog the day before, in payment of which he had given a check on his local bank, and, not being certain that he had enough money in the bank to pay the check, he had gotten $25 from his bookkeeper that morning and was hurrying to reach the bank before the check was presented for payment. On the way to the bank and while near the depot, he met deceased and told him that he had just bought a stud pup, whereupon deceased said, "I have been looking for you, you son-of-a-bitch; you had better be thinking about your neck instead of dogs." Defendant asked, "What is the matter, Morris?" when, according to defendant, deceased "said something about what my wife told his mother." According to defendant, he assured deceased there was some mistake, that he had said nothing desrespectful about his mother, and that if she had taken offense at anything he had said he would be glad to explain or apologize. The deceased did not accept the explanation and grew more angry as the discussion progressed, and, after frequently cursing defendant in angry tones and with violent language, finally said, "I am going to stamp your God

damn guts through your eyes," and as he said this deceased lunged at defendant and put his hand in his pocket; whereupon defendant jumped back a step or two, drew his pistol and fired twice in rapid succession. Deceased fell between the rails of the railway track with a bullet through his heart, from which he died in a very short time.

Witnesses saw the parties standing together and knew that a violent quarrel was in progress, but the testimony shows that defendant made only one gesture—that with his hands—during the conversation; while deceased was seen to shake his finger in defendant's face. A witness named Bittinger, who saw the beginning of the occurrence, heard deceased apply indecent epithets and threats to defendant, and supposed defendant would slap deceased, but when defendant failed to resent what was said, witness passed on and left the parties to their discussion. During all this time defendant had in one hand the bills which he had started to deposit in the bank. Immediately upon firing the shots, defendant went to the bank and deposited his money. He then went directly to the office of Dr. Hutchinson, whom he requested to go at once to the relief of deceased, making the statement at the time that he had been compelled to shoot him.

Defendant undertook to account for the possession of the pistol by stating that his store had been recently burglarized and a large quantity of goods stolen. He admitted that he had a pistol in his store and another in his residence. There was testimony on the part of the State that deceased fell at the place where he had been standing, thus indicating that he had not advanced on defendant; and it was shown that deceased's clothing was not powder burned, and that he was unarmed when he was killed.

It was shown that the evening before the killing deceased was talking about what defendant had said about his mother, something defendant's wife had told

his mother. Deceased told Dr. Hutchinson that he had
been compelled to call a doctor to see his mother on ac-
count of her excitement over what defendant's wife had
told her, and that he would see defendant the following
morning, and that if he did not apologize he would beat
him up so that the whole town would know he had been
whipped. Dr. Hutchinson undertook to pacify deceased,
but met with no success in his attempt. Dr. Hutchinson
communicated this fact to defendant that night, and
defendant said he thought he could adjust the matter.

The court allowed defendant to state fully every-
thing deceased said when they met in regard to the in-
sulting language used by defendant towards deceased's
mother, but excluded the testimony of a Mrs. Harding,
who was present when the conversation between Mrs.
Prewitt and Mrs. Hastings occurred and by whom they
offered to prove what the conversation was. Mrs. Hard-
ing would have testified, had she been permitted to do
so, that she heard the conversation, and that Mrs.
Prewitt repeated to Mrs. Hastings a remark of defend-
ant about how often he saw Mrs. Hastings on the street
and how spry and youthful she appeared to be, and
that the remark was a facetious compliment on Mrs.
Hasting's youthful appearance, and that there was
nothing in the remark susceptible of a construction de-
rogatory to Mrs. Hastings' character. Upon reflection,
Mrs. Hastings gave the remark a sinister interpretation,
and became excited and ill over it, and repeated the re-
mark to her son, giving, in its repetition, the interpre-
tation she then placed on it.

Defendant was not allowed to show by Dr. Hutch-
inson what his personal appearance and demeanor was
when he arrived at the doctor's office; and exceptions
were saved to that ruling.

The State called L. P. Spyker as a witness, who
testified that he was the station agent at Grady, and
was about ten feet inside his office and about twenty
feet from the scene of the killing when the firing com-
menced, and that he immediately went to a window

looking out on the scene of the killing. He described the relative situation of the parties, and, on his cross-examination, was asked this question: "When you looked out and saw Mr. Prewitt standing there, please describe to the jury what kind of expression was on his face at that time, as best you can." The prosecuting attorney objected to the question as being a mere conclusion of the witness, and the court sustained the objection and remarked at the time that "nothing could be determined from that testimony." Counsel for defendant then said: "We want to show from the expression on his face that there was no anger shown on his face at that time." The court remarked: "I don't think that is admissible, and it will be denied." Thereupon counsel stated that "the defendant offers to prove by this witness, on cross-examination, that there was nothing whatever in the expression on the face of the defendant immediately after the shooting to indicate the slightest anger or resentment, and that defendant's expression at that time reflected only fright and fear."

Numerous errors are assigned for the reversal of the judgment, the first of which is that the jury was not sworn to try the cause. After the adjournment of the term at which the trial was had the record was amended by a *nunc pro tunc* order to show that the jury was sworn; and it is now insisted that this order was made upon an insufficient showing. As the judgment is to be reversed, we do not stop to consider this question.

A great many other assignments of error are discussed in the briefs relating to alleged errors in the admission and exclusion of testimony and in giving and refusing instructions. We dispose of these questions generally by saying that we find no error in the record now before us except as hereinafter pointed out.

It does appear that the court gave no instruction defining reasonable doubt, although, in instruction num-

bered 7 given by the court, the jury was told to acquit the defendant if, upon the whole case, they had a reasonable doubt of his guilt.

The defendant asked instructions numbered 4 and 20 on the subject of reasonable doubt; but neither of those instructions undertoook to define that term, and, the court having told the jury to acquit if there was a reasonable doubt of defendant's guilt, no error was committed in refusing to multiply instructions to that effect. The defendant should have asked a correct instruction defining reasonable doubt, in which event only would he be in position to ask a reversal for a failure to define that term. *Lackey* v. *State,* 67 Ark. 416, 421; *Mabry* v. *State,* 80 Ark. 345, 349; *Hobbs* v. *State,* 86 Ark. 360, 361; *Horton* v. *Jackson,* 87 Ark. 528, 530; *Bradshaw* v. *State,* 95 Ark. 409, 411; *Holmes* v. *Bluff City Lumber Co.,* 97 Ark. 180, 188; *Hays* v. *State,* 129 Ark. 325; *Gunter* v. *Williams,* 137 Ark. 530, 537.

It also appears that the court gave no instruction on the question of the credibility of the witnesses. The defendant did ask an instruction on this subject, but the one asked was not a correct declaration of the law. It concluded with the statement that "and, if you believe that any witness has wilfully given false testimony as to any material fact in the case, you may reject the entire testimony of said witness, or you may reject that which you find to be false and accept the remainder."

In the case of *Taylor* v. *State,* 82 Ark. 540, an instruction of identical purport and of similar phraseology was reviewed and condemned by the court. Mr. Justice RIDDICK, speaking for the court, said: "This in effect tells the jury that if a witness has wilfully sworn falsely to any material fact, the jury may disregard his entire testimony, even though they should believe part of it to be true. But the jury has no right to reject any material testimony they may believe to be true. If a witness testified to a wilful falsehood in

reference to a material fact, the jury should take that into consideration in weighing other portions of his testimony; and, if they conclude that none of his testimony is worthy of belief, they should reject it; but they have no right to reject any truthful statement simply because the witness has told a falsehood about something else. It may happen that a witness, because he wishes to shield himself or for some other reason, may fail to tell the whole truth, may be guilty of a wilful misrepresentation as to his own interest in or connection with the crime, and yet, as to other facts throwing light on the crime, he may give evidence of the greatest importance. The jury, after being satisfied that he has sworn falsely as to any material matter, should scrutinize his other statements with great caution before accepting them as true; but, when once they become convinced that he has told the truth, they should not reject it. * * *'' Other later cases to the same effect are: *Griffin* v. *State,* 141 Ark. 46; *Johnson* v. *State,* 127 Ark. 524; *Johnson* v. *State,* 120 Ark. 202.

As the defendant did not ask a correct instruction on this subject, he is in no position to complain of the failure of the court to charge on that subject.

We are of the opinion that the court should have admitted the testimony of Mrs. Harding. The conversation which she would have detailed occurred only eighteen hours before the killing and was, without question, the cause of it; and we are of the opinion that the jury should have been allowed to know what the trouble was all about. It is true neither defendant nor deceased was then present, but the conversation was repeated to deceased by his mother shortly after it occurred, and the truth in regard to it as each party understood it may have probative value in ascertaining the motives of the respective parties. Testimony went to the jury, and properly so, that deceased was much incensed at what he thought was an offensive statement reflecting on his mother's virtue. Defendant was permitted to testify that he told deceased he had cast no

reflection on his mother, that he would be glad to explain and to apologize if deceased desired an apology. There was no witness to corroborate defendant, as no one heard the conversation between him and deceased.

The jury may not have believed defendant's statement. Had they believed his statement, it would have tended to show that defendant had no desire to kill deceased nor motive for doing so.

In the very recent case of *Avey* v. *State*, 149 Ark. 642, we held that proof of a motive for the killing was not a collateral matter. We there said: ''This court has many times held that the State is not required to prove a motive to establish the guilt of one accused of homicide; but the court has also held that, as the absence of a motive is a circumstance tending to show innocence, the State may show the existence of a motive for taking the life of a decedent, to be considered with other facts and circumstances in determining the guilt or innocence of the accused.'' See also *Appleton* v. *State*, 61 Ark. 590; *Carr* v. *State*, 43 Ark. 99; *Scott* v. *State*, 109 Ark. 391; *Phillips* v. *State*, 62 Ark. 119; *Carroll* v. *State*, 45 Ark. 539; *Chapline* v. *State*, 79 Ark. 444.

Had the testimony of Mrs. Harding been admitted, the testimony of defendant concerning his explanation to deceased and his attempt to conciliate him might have appeared more probable to the jury, and, if believed, might have led the jury to the conclusion that defendant was doing everything in his power, consistent with his safety, to avoid the difficulty. At least it had probative value tending to that effect.

We think the court properly excluded the testimony of Dr. Hutchinson about defendant's appearance when he appeared at the office of the witness. Too much time had intervened between the time of the killing and that conversation. Opportunity had then been afforded for reflection and dissimulation.

But we think the testimony of Spyker should have been admitted. He was asked about defendant's ap-

pearance at the very time of the killing—while the smoking pistol was in defendant's hand. The witness should have been allowed to describe to the jury the expression on the face of defendant at the time as best he could as he was requested to do in the question which the court refused to permit him to answer.

In Vol. 3 of Wigmore on Evidence, § 1974, that learned writer says: "The Opinion rule is often sought to be applied to forbid compendious descriptions of the *appearances externally indicating internal states*—for example, whether a person 'looked' sick or sad or angry. There is no more reason in this class of cases than in the preceding one for the Opinion rule to exclude the testimony. The exclusionary rulings perhaps here abound particularly in absurdities and quibbles—highly fit for cynical amusement, were not the names of Justice and Truth involved in their consideration. One may wonder how long these solemn farces will be perpetuated in our law.

In the note to the text quoted many cases are cited in which various courts have held that it is competent for a witness to describe one's personal appearance, as, for instance, that he was angry, sick, excited, etc. See also Vol. 2 Wharton's Criminal Evidence, § 922; 3 Chamberlayne, Modern Law of Evidence, § 1934; 16 C. J. p. 753, § 1545; *Miller* v. *State,* 94 Ark. 538; *Decker* v. *State,* 85 Ark. 64; *Fort* v. *State,* 52 Ark. 180.

The defendant's right to kill depended on the necessity so to do as the circumstances then appeared to him, and proper instructions on that subject were given to the jury. Did the defendant believe that the threats of great bodily harm which had just been angrily made were about to be executed? Was the threatened injury impending and about to fall? And did defendant fire the fatal shots because of this fear and to save himself from the threatened fate; or did he fire the shots maliciously? In the one case, he had the right to fire; in

the other, he did not. We think the testimony as to defendant's appearance at the time he fired the shots has probative value in passing on that question.

Appellant requested an instruction numbered 17, which told the jury that, in deciding the true situation of the parties at the time their respective feelings and intentions, the jury should take into account "their threats, if any, and their relative strength and power, because, in a contest between a powerful individual and a weaker, the necessity of taking life in self-defense will be more apparent and easily discoverable." It is very earnestly insisted that this instruction was proper, and that prejudicial error was committed in refusing it.

We do not agree with counsel in this contention. The instruction was argumentative in form. It was, of course, proper for the jury to consider the circumstances there recited; but this court has said in many cases that it is not good practice to single out and specially direct the attention of the jury to particular circumstances, thereby appearing to emphasize the circumstances named. The jury should be directed to consider all the circumstances established by the testimony, and this was fully and clearly done in a number of instructions given by the court, several of which were given at the request of the defendant.

We think there is no other error in the record; but the judgment must be reversed for the errors indicated. It is so ordered.

McCULLOCH, C. J., (dissenting). It is undisputed that up to the fatal encounter between appellant and Hastings they had been good friends, and that the cause of the ill feeling between them which resulted in the encounter was the anger and resentment aroused in the mind of Hastings by the report that appellant had made an insulting remark about his mother. It appears from the testimony that this report was unfounded, and that appellant had not, in fact, made an insulting remark about Mrs. Hastings. It is also undisputed that Hastings

was the aggressor in the encounter, but there is a conflict as to the extent of his conduct, whether it was sufficient to justify appellant in firing the fatal shot.

It was competent to show, and the court permitted the greatest latitude in proving, all of the previous conduct of both parties, for the purpose of showing their state of mind. Appellant was allowed to show that he had not made any unfavorable remark about Mrs. Hastings, and he was allowed to show by the statements and alleged threats of Hastings that the latter was intensely angry and resentful about what he had heard was appellant's remark about his mother. I am wholly unable to understand upon what theory it is admissible to prove the conversation between Mrs. Prewitt and Mrs. Hastings. It was a conversation wholly between third parties, neither of the parties to the fatal encounter being present, and it could only have presented a matter entirely collateral to the main issue. It had no bearing whatever on the conduct, or motives, or state of mind, of either of the parties to the encounter. Moreover, it could have had no beneficial effect upon plaintiff's defense, unless the jury had seen fit to try the case on the issue as to whether or not Mrs. Prewitt or Mrs. Hastings was at fault. It was unimportant whether the report to Hastings about what appellant had said about his mother was true or false, for, as before stated, it is undisputed that Hastings had been aroused to a high pitch of anger toward appellant by the report of the remark made by Prewitt about Mrs. Hastings. It could not have helped appellant's case to show that Hastings' anger was without cause, and it certainly was not competent to show this by a conversation between two other persons, even though these persons were the mother and wife, respectively, of Hastings and appellant:

The other ground of the reversal is that the court erred in refusing to allow appellant to prove by witness Spyker that immediately after the shooting the witness saw nothing about appellant to "indicate the slightest anger or resentment, and that the defendant's expression

at that time reflected only fright and fear.'' It seems to me that this is merely an attempt to prove a conclusion by the witness, and not to prove facts upon which the jury might draw an inference or conclusion. The authorities holding such testimony as competent put it on the ground that the witness should be permitted to state his conclusion after stating the facts upon which the conclusion is based; that is to say, where the witness states that the face of the party was flushed or pallid or that the eye-balls were inflamed, or. any other fact that would indicate the state of mind of the party, the witness may then state his own conclusion, based upon those facts, but it seems to me to 'be a mere conclusion for a witness, without giving the facts, to state what the expression on the face of the party indicated. Anger and fright are emotions which generally manifest themselves on the human countenance by physical evidences, about which any witness may testify, but it is purely an opinion or conclusion for a witness to state that these emotions existed without stating the facts constituting physical evidence of those emotions. I believe that none of the authorities, save Professor Wigmore, go to the extent that the court has gone in this case, and the intemperate statement of that learned author in the opinion of the majority is, to my mind, not at all convincing.

But, even if this testimony of witness Spyker was competent, it only tended to show the mental attitude of appellant at the time of the shooting, and could only have been considered by the jury in determining whether or not there was malice. The jury found on sufficient evidence and upon proper instructions that the killing was unnecessary, and if this testimony had been admitted, and the jury had accepted it as a true indication of appellant's feelings at the time, it could only have had a ligitimate tendency to alter the verdict with respect to the degree of the homicide. It seems to me, therefore, that, even if the testimony is competent, it ought only to call for a reduction of the degree of the judgment to a

conviction for manslaughter. I am unwilling, however, to say that the court erred in either particular in its ruling on the admissibility of testimony.