SELMAN *v.* STATE.

Opinion delivered May 21, 1923.

1. HOMICIDE—RES GESTAE—INSTRUCTIONS:—While the declarations of the accused to third persons immediately prior to the alleged shooting were competent as part of *res gestae* to show the motive or state of mind of the accused, it was not error to instruct the jury, in view of testimony on the part of the State, that "you have a right to judge whether the accused was sincere in the avowal of his purpose or merely made such statements in order to provide testimony in his favor in case of need."

2. HOMICIDE—VOLUNTARY MANSLAUGHTER—INSTRUCTIONS.—A requested instruction that "if you find from the evidence that the defendant shot deceased under the belief that he was about to be assaulted by the deceased, but that he acted too hastily and without due care, and for that reason was not justified in taking the life of the deceased, in the absence of malice, he would at most only be guilty of manslaughter," *held* properly refused, as being argumentative and as implying that defendant might be guilty of a lower grade of homicide than voluntary manslaughter.

3. CRIMINAL LAW—INVITED ERROR.—Where defendant introduced incompetent evidence as to a collateral matter, he cannot complain because the State introduced rebutting evidence of a similar character.

Appeal from Sevier Circuit Court; *B. E. Isbell,* Chancellor; affirmed.

*Lake & Lake* and *J. S. Steel,* for appellant.

The court erred in giving instruction numbered 25 as requested for the State. *Cornelius* v. *State,* 12 Ark. 782. It was an instruction on the weight of the testimony. Sec. 23, art. 7, Constitution; 133 Ark. 314; 154 Ark. 75. Court erred also in refusing to give appellant's requested instruction No. O. 102 Ark. 180; 110 Ark. 402; 74 Ark. 444. Prejudicial error was also committed in permitting the letter of Oct. 12, 1922, to be introduced in evidence.

*J. S. Utley,* Attorney General, *John L. Carter* and *Wm. T. Hammock,* Assistants, for appellee.

No error committed in giving instruction No. 25. *Cornelius* v. *State,* 12 Ark. 786. *Res gestae.* Wharton on Evidence, 258, 267; 58 Ark. 168; 3 S. W. (Ark.) 51; 157 Mon.; 31 N. E. 961; 2 L. R. A. 235; Words & Phrases, 6136. Appellant's requested instruction No. O, refused, was not a correct statement of the law. 74 Ark. 461; 113 Mo. 670; 107 Mo. 36; 52 Ark. 345; 77 Ark. 474; 95 Ark. 409; 106 Ark. 8. If error committed in allowing introduction of letter, it was invited.

WOOD, J. G. G. Billings, a lawyer living in the city of DeQueen, Arkansas, whose office was situated upstairs in what is designated as the Tobin building, on the morning of September 21, 1922, was shot and killed in his office by Roy Selman. Selman was indicted for the crime of murder in the first degree for the killing of Billings, and was tried and convicted of murder in the second degree, and sentenced, by judgment of the court, to imprisonment in the State Penitentiary for five years, from which judgment he appeals.

Mrs. Billings, who assisted her husband in the office work, was in the office on the morning of the killing. Selman was in the office that morning about fifteen minutes before the shooting. He left the office, stating that he was going to the courthouse. While he was in the

office, he showed no feeling of anger toward Billings.
Mrs. Billings heard her husband asking Selman if he had
come up there for trouble, and Selman replied, "No,"
that he was not looking for trouble. After he left the
office she took her baby and went to the drugstore, and
while standing just outside the drugstore heard that her
husband was shot. She ran to the office, and found him
sitting in the chair where she had left him. There were
two shots in his neck, one almost in the center and the
other through the collar, and one finger of his right hand
was almost severed. Billings said, "Roy Selman walked
into the room and says, 'I have got the dope for you,'
and shot me twice." She asked Billings what he said to
Selman, and Billings replied that he didn't say anything
—that Selman didn't give him time.

Another witness, who heard two shots fired, in a
few seconds thereafter saw Selman emerge from the
Tobin building and go towards the courthouse. He saw
Selman hand his pistol to another party. Witness asked
him what was the matter, and he replied that he had
shot Billings. He said: "I started in to see him, and
he made for his old gun, and I shot him." Witness went
up to Billings' office and found him sitting in a rocking-
chair, with two bullet wounds in his neck. He spoke to
witness and said, "Tom, he has killed me."

Several witnesses who went into Billings' office im-
mediately after the shooting testified to the effect that
Billings said that when Selman came in he said, "I
have got the drop on you," and shot me. One of these
witnesses, Abe Collins, a lawyer living at DeQueen,
stated that when he went into Billings' office he found
Billings sitting in his rocking-chair with his head thrown
back. Billings said, "Roy Selman has killed me." Two
or three minutes after this they put Billings on a
stretcher and he assisted in carrying him to the hospital.
While carrying him he asked Billings what he had done
to Selman, and Billings replied, "Tried to collect a debt."
Witness then asked Billings, "What did you do to try

to collect the debt?'' and Billings replied, ''Garnish.''
Billings told witness, in the conversation, that when Selman came in the office he said, ''I have got the dope on you, or dope for you.'' Witness asked Billings if he did anything or attempted to do anything to Selman, and Billings replied, ''Not a thing.'' Billings died about an hour thereafter.

Other witnesses testified to the effect that they heard Billings say that Roy Selman shot him and had killed him. One of the witnesses stated that he heard Billing say that Roy Selman had made the second trip to his office; that he came to the door the second time and Billings invited him in. He stepped in and said, ''I have got the dead wood on you and, d—— you, I am going to use it.'' Another witness, who was rooming in the Tobin building, just across from Billings' office, was sitting in his room when he heard the shots, and just prior to the shooting he heard some one come up stairs and go to Billings' room, and heard Billings say, ''Come in.'' Then the door slammed, and the two shots were fired.

Another witness, who was on a telephone pole where he could look into Billings' office, stated that he just happened to look over in the window, and just as he did so he saw something bright up there, and saw Billings sitting in the chair, and saw whoever it was in front of him with the bright gun. He saw the gun flash twice and Billings sitting in the chair when the first shot was fired. When the first shot was fired Billings jumped out, and when the second shot was fired he jumped back in his chair.

The appellant testified in his own behalf, and, after relating various conversations and controversies he had had with Billings concerning the claims of parties against appellant that had been put in the hands of Billings for collection, stated that Billings had in his hands the claim of one McKinney. He had paid Billings twenty dollars on this claim. Billings denied this, and said to

witness, "I am darn tired of fooling with you." Billings said concerning this claim, "That is one debt you are going to pay." Appellant told Billings that if he would give him credit for the $20 he had paid him, he would give him an order for ten dollars out of every two weeks' wages until the whole debt was paid, but that he could not pay it at that time. Billings replied to this, "That is one debt you are going to pay. I will send two or three of you sons of a b———s to hell." Appellant made no reply to this statement. Appellant stated that he had been to Billings' office that morning to see him about this claim. He told Billings that he had been summoned. Billings told him to go and get the summons and bring it to him. Appellant went out and found it where he had dropped it, and, after a short conversation with one McCowan, whom he met on the street, in which conversation nothing was said about Billings, he again started up to Billings' office to carry the paper. When he got to the office the door was closed. He knocked on the door, and Billings told him to come in. He walked inside and closed the door. He had the paper in his left hand. He took two steps and said: "Here is that paper for you." Billings came over like this (demonstrating) and said, "You son of a b———, I have fooled with you the last time I am going to." When Billings made that remark he moved toward the drawer of the desk. Appellant jerked his gun out and fired twice. He shot Billings because he thought Billings was preparing to shoot him with a pistol. Appellant had seen a gun in the drawer once or twice before that, and he thought Billings was trying to get it. During all the conversations with Billings the appellant was not mad and used no angry word toward him. He shot at Billings' hand, thinking that would stop him. The shots were fired about as close together as a double-action could be fired.

Appellant's testimony further shows that he was employed by the Kansas City Southern Railway Com-

pany, working as night-watchman at the roundhouse. In the performance of his duties as a guard at the round-house he had a pistol, and that was the pistol with which he shot Billings. He had been carrying it home with him when he was off duty.

Various witnesses testified on behalf of the appel-lant as to his conduct on the morning of, and prior to, the killing. One witness, Irwin, a justice of the peace, stated that Selman came to his office on that morning about 7:15 and stated the facts to him with reference to garnishments that had been issued on the McKinney and Tobin claims against appellant. Irwin had succeeded McKinley as justice of the peace, and he prepared cer-tain papers for Selman, reciting that no judgment had been rendered by McKinley against Selman on the Mc-Kinney claim.

The attorneys of the appellant, with whom he had consulted on the morning of the killing in regard to the claims that Billings had in his hands for collection, tes-tified to the effect that at the time appellant was con-sulting with them he talked in an ordinary tone of voice and did not show any malice or anger toward Billings. The testimony of other witnesses on behalf of the ap-pellant was to the effect that they heard Billings, in the conversation with reference to these claims, make the remarks which appellant testified that he did make, show-ing that he was angry with appellant, and that appellant made no reply to the angry remarks of Billings, and did not manifest any anger himself. On the contrary, two of the witnesses stated that he was not mad at all, and one of them stated that he seemed to be in a good humor. There was testimony tending to show that Billings, shortly before the killing, stated that he had a pistol in his drawer that he kept for fellows that got unruly in his office, and he indicated the drawer right by his side in which he said he kept it. There was testimony that the pistol had been seen in this drawer the Satur-day before the shooting and the Thursday before the

shooting. Witnesses for the State had testified that there was no pistol in the desk drawer in Billings' office.

The above states substantially the material facts which the testimony for the State and the appellant tended to prove. The court instructed the jury on the law of murder in the first and second degree, and also on the law of self-defense. The motion for a new trial contained forty-one assignments of error, but learned counsel insist here upon only three of these.

1. The first ground urged for reversal of the judgment is that the trial court erred in giving instruction No. 25, requested by the State, which is as follows: "You are instructed that declarations of the accused to third persons immediately prior to the alleged shooting are competent evidence to show the motive or state of mind of the defendant, but, in accepting such testimony, you have a right to judge whether the accused was sincere in the avowal of his purpose or merely made such statements in order to provide testimony in his favor in case of need."

The testimony as to the conduct of the appellant immediately preceding the killing, to the effect that he had expressed no ill-will on that morning against Billings and that he was in a good humor, and that he went to the office of Billings on a peaceful mission, was allowed to go to the jury without objection on the part of the State. The court admitted this evidence on the theory that it was a part of the *res gestae.* The pertinent inquiry was whether or not appellant's visits to Billings' office on the morning of the killing were on the legitimate and peaceful mission of consulting with him about the claim which he had in his hands for collection against the appellant, or whether these visits were to avenge what he conceived to be a wrong done him by Billings in persistently pursuing him by suits and garnishment of his wages for the collection of these claims. The testimony, under the circumstances, was relevant only to prove motive or the absence of motive and appellant's

state of mind at the time of the killing, and the court properly so limited it. Appellant's declarations concerning the summons and writs of garnishment pertaining to the claims which Billings had in his hands for collection, and his conduct and appearance while discussing these claims with Billings on that morning, and his declarations, conduct and appearance while talking with others preceding the killing, were so closely connected to the killing in time, and apparently so free from any self-serving purpose, that the court properly admitted same as tending to illustrate and explain the motive of appellant in going to Billings' office. *Cornelius* v. *State,* 12 Ark. 782-805. See also *Prewitt* v. *State,* 150 Ark. 279; *Sneed* v. *State, ante* p. 65. But, in the light of what happened—the killing of Billings by appellant, under the circumstances which the testimony of the State tended to prove—it was for the jury at last to determine whether the declarations of appellant, tending to prove that his mission was peaceful, were truthful and his acts sincere, or whether they were only simulated for the purpose of disguising a motive to kill.

The instruction of the court was not an instruction on the weight of the evidence, and it did not invade the province of the jury, but, on the contrary, left the jury to determine, upon the consideration of the testimony, what the real motive of the appellant was in going to the office of Billings. The ruling of the court in granting this prayer for instruction was in harmony with the law as announced by the court in *Cornelius* v. *State, supra.*

2. The appellant next contends that the court erred in refusing to give his prayer for instruction numbered "O" as follows: "If you find from the evidence that the defendant shot deceased under the belief that he was about to be assaulted by the deceased, but that he acted too hastily and without due care, and for that reason was not justified in taking the life of the deceased, in the absence of malice, he would at most only be guilty of voluntary manslaughter."

Learned counsel for appellant in their brief say: "In this instruction the jury were told that if they should find from the evidence that defendant shot deceased under the belief that he was about to be assaulted by the deceased, but that he acted too hastily and without due care, and for that reason was not justified in taking the life of the deceased, in the absence of malice he would only be guilty of voluntary manslaughter." If the language of the prayer for instruction "O" had been as set forth above in the brief of counsel for appellant, then the court should have granted the prayer, and would have erred in not doing so. See *Allison* v. *State,* 74 Ark. 444; *Collins* v. *State,* 102 Ark. 180; *Brandes* v. *State,* 110 Ark. 402; *Phares* v. *State,* 155 Ark. 75. But the refused prayer was not in the form set forth in the "brief and argument" of counsel, and, in the form presented, it was not a correct declaration of law. The concluding clause of the instruction, to-wit: "he would at most only be guilty of voluntary manslaughter," was argumentative in form and incorrect in substance, because it carried the implication that the appellant might be guilty, under the evidence adduced, of a lower grade of homicide than voluntary manslaughter. Whereas, the undisputed testimony shows that, if guilty at all, he could not have been guilty of a less degree of homicide than voluntary manslaughter. The jury, under the evidence, could not have found him guilty of involuntary manslaughter. Although appellant would have been entitled to an instruction correctly declaring the law on voluntary manslaughter as applicable to the facts, if such an instruction had been prayed, yet it was not reversible error for the court to refuse the prayer of appellant on that subject, because such prayer was erroneous. See *Allison* v. *State.* 74 Ark. 444; *Prewitt* v. *State,* 150 Ark. 279, and cases there cited.

3. The appellant testified that his first experience with Billings was in 1921, when the latter had a claim in favor of Tobin Brothers against the appellant, which claim was reduced to judgment before one O. Edington,

a justice of the peace, and on which judgment a garnishment was issued; that he had settled this claim. The docket entries of the justice of the peace and writ of garnishment in regard to the Tobin claim were identified and introduced in evidence by the appellant. Among these entries was the following: "9-20-22 Garnishment issued Kansas City Southern Railway Company, returnable Oct. 22, 1922. Oct. 13, 1922, settled in full." The writ of garnishment introduced by appellant showed that it was based on the Tobin Brothers judgment of the 21st of May, 1921, before O. Edington, justice of the peace. It stated that the judgment remained unsatisfied, and a writ was issued against the Kansas City Southern Railway Company commanding it to appear and answer on Oct. 2, 1922. The writ showed that it was served on the 20th of September, 1922, by delivering a copy to T. H. Short, agent of the Kansas City Southern Railway Company, as therein commanded. On cross-examination, the State, over the objection of the appellant, was permitted to introduce a letter purporting to have been written by an agent of the Kansas City Southern Railway Company which accompanied the justice docket and the other papers which had been introduced in the cause by appellant. It appeared from this letter that inclosed therein to the justice of the peace was a pay-check of the Kansas City Southern Railway Company to Roy Selman, properly indorsed, to settle the claim of Tobin Brothers against Roy Selman. The appellant objected on the ground that the letter purported to be written by the agent of the Kansas City Southern Railway Company after the death of Billings, and that it was therefore incompetent. The court permitted it to be introduced in confirmation of the indorsement on the judgment, "settled in full," which was not dated.

Counsel for the appellant contend that the ruling of the court in allowing this letter to be read to the jury was erroneous and prejudicial to appellant, as it tended to discredit the testimony of appellant to the effect that

he had paid the Tobin claim in full in 1921. It was error to permit the introduction of the letter in evidence, but the error was one which the appellant invited, and therefore he is not in an attitude to complain. The docket entries and court writs which appellant was permitted to introduce concerning the Tobin claim were wholly incompetent and irrelevant to the issue of the guilt or innocence of the appellant. It was perhaps permissible for the appellant himself to testify concerning this claim as a part of the history of the transactions which led to the fatal rencounter between himself and Billings, but when appellant introduced docket entries and papers before the justice of the peace concerning that claim, in corroboration of his testimony, he was thus permitted to resort to wholly collateral matters in corroboration of his own testimony. The court should not have allowed this, but, having done so at the instance of the appellant, he was then not in an attitude to object to the testimony which the State introduced of the same character tending to rebut the testimony of the appellant on the collateral matters which he had brought into the record. The appellant cannot complain of error which he himself invited. *Beck* v. *Biggers,* 66 Ark. 368; *Kan. City So. Ry. Co.* v. *Belknap,* 80 Ark. 587; *Mitchell* v. *Smith,* 86 Ark. 486; *Tarkington* v. *State,* 154 Ark. 365-367.

The judgment is correct, and it is affirmed.